752 A.2d 200

**PHILIP MORRIS INCORPORATED, et al.**

v.

**The Honorable Edward J. ANGELETTI.**

**Misc. No. 2, Sept. Term, 1998.**

Court of Appeals of Maryland.

May 16, 2000.

692

694

696

Gary R. Long (Robert C. Heim, Judy L. Leone, Ronni E. Fuchs, Dechert Price & Rhoads, Philadelphia, PA; James K. Archibald, Marina Lolley Dame, Venable, Baetjer and Howard, LLP, Baltimore), all on brief, for appellants.

Carmen M. Shepard, Deputy Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore), Sherrilyn A. Ifill, Professor of Law, University of MD School of Law, for appellee.

Argued June 4, 1998 before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

Reargued April 6, 2000 before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

RAKER, Judge.

Petitioners, a host of tobacco manufacturers and related entities, have filed a petition with this Court for a writ of mandamus or prohibition, asking that we direct the Circuit Court for Baltimore City to vacate its certification of two classes of Maryland residents who, as current or former users of tobacco products, have filed a suit against Petitioners claiming to have been injured by tobacco use or addicted to nicotine. We shall grant the extraordinary relief of mandamus and order the Circuit Court to decertify the classes.

## I. The Case

On May 24, 1996, Respondents [1] filed a complaint in the Circuit Court for Baltimore City against all manufacturers of

---

1. For purposes of this opinion, we shall use the term "Respondents" in reference to the class action representatives named in the Circuit Court's Class Certification Order. The Respondent officially designated in the petition for writ of mandamus or prohibition is The Honorable Edward J. Angeletti, Judge of the Circuit Court for Baltimore City, who issued the Class Certification Order in the case below, entitled *Richardson v. Philip Morris Inc.*, No. 96145050/CE212596. The State, through the Attorney General, has filed a brief answer to the present petition on behalf of Judge Angeletti. Filing an extensive opposition to the petition

tobacco and their Maryland distributors, as well as two industry trade groups and a marketing and public relations firm, the majority of whom have jointly filed the petition now before this Court.[2] Seeking both compensatory and punitive damages as well as injunctive relief, Respondents assert claims on behalf of themselves and all similarly situated Maryland residents (a) who have suffered or continue to suffer from physical injuries or disease caused by smoking cigarettes or using smokeless tobacco products, and/or (b) who are nicotine dependent and plead addiction as an injury. Respondents' Fourth Amended Complaint alleges ten counts, eight of which embody traditional causes of action sounding in tort and contract: fraud and deceit, negligent misrepresentation, intentional infliction of emotional distress, negligence, breach of express and implied warranties, strict product liability, and conspiracy. In addition, the complaint avers that Petitioners have violated several provisions of the Maryland Consumer Protection Act, codified at Maryland Code (1975, 2000 Repl. Vol.) §§ 13–101 to 13–501 of the Commercial Law Article. Lastly, Respondents plead a cause of action heretofore unrec-

---

are the named class action representative plaintiffs, Mildred C. Richardson (acting on behalf of herself and as the personal representative of her husband, James B. Richardson), Karol Potter and Lonza B. Cutchin.

2. Petitioners are tobacco manufacturers and distributors Philip Morris Inc., R.J. Reynolds Tobacco Company, Lorillard Tobacco Company, Brown & Williamson Tobacco Corporation, individually and as successor in interest to The American Tobacco Company, British–American Tobacco Company Limited, United States Tobacco Company, Crown Service, Inc., George J. Falter Company, A & A Candy & Tobacco Company, Inc., and I.K. Candy, Tobacco & Hosiery Company; industry trade groups and lobbyists The Council for Tobacco Research–USA, Inc. and The Tobacco Institute, Inc.; and the advertising and public relations firm of Hill & Knowlton, Inc. Other defendants named in the case below yet not directly party to the present petition are Petitioners' parent corporations, sole shareholders, alter egos, successors in interest, or like entities. In addition, Liggett Group, Inc. and related corporations were named defendants in the case below but, for reasons not explicitly made known to this Court, have apparently not joined in this petition for writ of mandamus or prohibition despite the fact that counsel for Respondents have "refused to dismiss Liggett from this suit." (Opposition to Petition at 22) [hereinafter Opp'n to Pet.].

ognized in Maryland, requesting equitable/injunctive relief in the form of court-supervised, defendant-funded "medical monitoring" of the classes, to detect, prevent and treat future disease, and to treat addiction.

Respondents filed a Motion for Class Certification on September 5, 1997. Following oral argument on the motion, the Circuit Court issued an Order and Memorandum Opinion on January 28, 1998, granting the Motion for Class Certification. More specifically, the court approved for class action treatment, under Maryland Rule 2–231(b)(3), Respondents' eight traditional tort and contract causes of action and single consumer protection claim. In addition, the trial judge found Respondents' claim for medical monitoring appropriate for prosecution as a class action, under Rule 2–231(b)(2).

Thereafter, on February 19, 1998, the Circuit Court issued the following order certifying two classes:

Case No. 96145050/CE212596, styled *Mildred C. Richardson, et al., Plaintiffs v. Philip Morris Inc., et al., Defendants* shall be maintained as a class action on behalf of the following classes of plaintiffs:

a) *Serious Injury and Death Claims:*

All Maryland residents as of the date of class notice who have suffered, presently suffer, or who have died of diseases, medical conditions, and injury (while a resident of Maryland) caused by smoking cigarettes or using smokeless tobacco products that contain nicotine, and

1) The estates, representatives, and administrators of these persons; and

2) The spouses, children, relatives and significant others of these persons as their heirs or survivors; and

b) *Nicotine Dependence Claims:*

All nicotine dependent persons in Maryland who have purchased and used cigarettes and smokeless tobacco products manufactured by the Defendant Tobacco Companies. For the purposes of defining this class of claims, "nicotine dependent" shall be defined as:

1) All cigarette smokers or smokeless tobacco users who have been diagnosed by a medical practitioner as nicotine dependent, and/or;

2) All cigarette smokers who have regularly smoked more than 15 cigarettes per day for at least three years and who have made at least one unsuccessful effort to quit smoking, and/or;

3) All regular daily users of smokeless tobacco products for at least three years and who have made at least one unsuccessful effort to quit using smokeless tobacco.[3]

(Circuit Court Class Certification Order at 1–2). The order excluded all past and present officers, directors, and agents of the defendant corporations from the classes. In addition, the order named class representatives, designated counsel for the classes, approved a Class Action Notice Plan, and provided for exclusion of class members.

By virtue of its orders in this case, the Circuit Court implicitly approved Respondents' proposed trial plan, which consists of three phases. Phase I would entail a class action jury trial conducted principally to determine whether Petition-

---

**3.** Respondents had also proposed the following subclasses to assist in managing the litigation:

1. Smokers with diagnosable symptoms of smoking related diseases as defined in the Class Notice, such as Representative Plaintiffs Mildred Richardson, Karol Potter, Lonza Cutchin and other, additional, class representatives.

2. Smokeless tobacco users with diagnosable symptoms of disease.

3. Smokers who are nicotine dependent but who have no diagnosable symptoms of disease.

4. Nicotine dependent users of smokeless tobacco products who have no diagnosable symptoms of disease.

5. Smokers who are nicotine dependent and commenced smoking prior to implementation of the 1969 Cigarette Labeling Act.

6. Smokers who are nicotine dependent and commenced smoking after implementation of the 1969 Cigarette Labeling Act.

(Circuit Court Memorandum Opinion at 3) [hereinafter (Cir.Ct.Mem. Op.)]. In addition, the one subclass of persons claiming to be stricken with smoking-related diseases would be further divided into subclasses for the twelve different diseases Respondents claim that smoking causes. *See id.* at 3 n. 3.

ers are liable to the classes. During Phase I, the jury would make determinations as to factual and legal issues allegedly common to all members of the classes, including, *inter alia,* whether the nicotine in Petitioners' cigarettes and smokeless tobacco products are addictive; whether Petitioners have manipulated nicotine levels of their products; whether Petitioners knew and intentionally concealed information that tobacco causes disease; whether cigarettes are defectively designed; whether the 1969 Federal Cigarette Labeling and Advertising Act preempts any claims by Respondents or the class members; whether contributory negligence and assumption of the risk are applicable under Maryland law; and whether punitive damages are applicable under Maryland law.

For any claims upon which Respondents prevail during Phase I, Phase II would enable the named representative of each class or subclass to try the issues of causation and damages before the class jury. Finally, Phase III would involve trial of individual issues of class membership, causation, smoking history and damages for each and every absent class member. During Phase III, after having established class membership, individual class members could proceed in one of several ways: (1) conduct a full jury trial on Phase III issues; (2) accept the damages determined in Phase II; (3) conduct a summary jury trial on Phase III issues; or (4) conduct proceedings before a magistrate or special master on all Phase III issues.

On February 25, 1998, Petitioners filed a Motion for Reconsideration of Class Notice and to Stay Issuance of Class Notice. The Circuit Court held a hearing on this motion on March 27, 1998 and ultimately denied it. On April 8, 1998, Petitioners filed the present Petition for Writ of Mandamus and/or Writ of Prohibition, urging this Court to issue a writ commanding the Circuit Court to decertify the classes. On the same day, Petitioners filed a motion in the Circuit Court for Baltimore City requesting a stay of class notice pending this Court's consideration of the Petition for Writ of Mandamus and/or Writ of Prohibition, which motion the Circuit Court denied. On May 7, 1998, Petitioners filed with this

Court a Motion for a Stay of Class Notice Pending Petition for Writ of Mandamus and/or Writ of Prohibition, oppositions to which Respondents and the Attorney General filed a week later. On May 15, 1998, this Court ordered that the Motion for Stay be granted pending this Court's decision on the present Petition for Writ of Mandamus and/or Writ of Prohibition.

## II. Arguments

We shall lay out the stated positions of the parties in this section, and discuss certain arguments in more detail throughout the opinion. Petitioners argue that this Court should issue a writ of mandamus or prohibition because irreparable harm will result to the parties and the judicial system if Petitioners are required to await end-of-the-case appeal. According to Petitioners, the opportunity to appeal the class certification might not arise until the Phase III trials are well underway, which, if class certification is improper, would entail a tremendous waste of judicial resources. Hence, we are urged to compel the Circuit Court to decertify the classes as an exercise in aid of our appellate jurisdiction or, in the alternative, as an execution of this Court's superintendency, whether inherent or bestowed, over the lower courts of this State.

Petitioners contend that the Circuit Court grossly abused its discretion in certifying the class action in violation of Maryland Rule 2–231 and Petitioners' constitutional rights. They maintain that because of the number of individual liability issues involved in this litigation, the Circuit Court grossly abused its discretion in holding that Respondents met the class action requirements of predominance, superiority and manageability. Most notably, the Circuit Court either ignored or glossed over several significant individual issues, such as conflict-of-laws, contributory negligence, assumption of the risk, statutes of limitation, fraud and reliance, and causation, the aggregation of some or all of which precludes certification.

Finally, Petitioners attribute four errors of law to the Circuit Court in rendering its decision. First, Petitioners

argue that the splitting of interrelated issues, most notably general liability to the classes and causation of injury to individual class members, violates their federal and Maryland constitutional rights. Petitioners additionally assert that the Circuit Court erred in certifying a medical monitoring class, that it impermissibly separated punitive damages from liability determinations, and that class counsel suffer from a conflict of interest ethically disabling them from representing the classes, and thereby creating illicit, fail-safe classes.

Respondents[4] counter that this Court lacks the power to issue writs of mandamus or prohibition. According to Respondents, our decision in *In re Petition for Writ of Prohibition*, 312 Md. 280, 539 A.2d 664 (1988), in which we recognized that "mandamus or prohibition may issue in aid of appellate jurisdiction," *id.* at 302, 539 A.2d at 675, was superseded by Title 8, which governs appellate procedure in the Court of Appeals and which does not expressly provide for writs of mandamus or prohibition. Even if appellate review is appropriate at this time, Respondents assert that this Court cannot properly assert jurisdiction without offending the "primary jurisdiction" of the Court of Special Appeals: we must wait until the matter, presumably in the form of a petition for writ of mandamus or prohibition, is pending in the intermediate appellate court, at which point we would be free to exercise our powers of certiorari.

Assuming that this Court does have the authority to issue such a writ, Respondents exhort that we rule the present petition untimely because Petitioners did not file it with this Court until seventy days after the Circuit Court's January 28, 1998 order granting Respondents' Motion for Class Certification. "To the extent that nonstatutory appellate jurisdiction is recognized at all," argue Respondents, "it must be invoked within the prescribed time for obtaining review in any form," which, Respondents posit, is thirty days from the date of a

---

4. In its answer to the present petition, *see supra* note 1, the State offers arguments on behalf of Judge Angeletti that are essentially similar to those of the class representatives.

decision. Moreover, the writ requested by Petitioners would be ineffectual if issued. Petitioners have expressly requested only that this Court vacate the Circuit Court's Class Certification Order dated February 19, 1998. Granting this mislabeled or under-inclusive request arguably would leave the Circuit Court's previous order of January 28, 1998 granting class certification intact and in effect. Because the requested writ would therefore be futile, assert Respondents, this Court ought not grant it.

Respondents further argue that the appropriate standard for determining whether a writ of mandamus or prohibition shall issue is whether there was a judicial "usurpation of power," not whether the Circuit Court's ruling was "erroneous" or "an abuse of discretion." According to Respondents, the lower court's judgment was consistent with the law applying class certification requirements to long-term mass tort cases centered upon products liability (as distinguishable, perhaps, from cases arising out of a single-event disaster), its decision was carefully reasoned and supported, and its order effected an appropriate exercise of judicial power. Specifically, Respondents contend that the Circuit Court correctly and thoughtfully decided that the proposed classes complied with both the Rule 2–231(a) requirements of numerosity, commonality, typicality and adequacy, and the Rule 2–231(b)(3) requirements of predominance, superiority and manageability. Furthermore, Petitioners possess an adequate legal remedy to correct any mistake on the Circuit Court's part, namely the right of appeal after a final judgment. For this reason alone, a writ of mandamus or prohibition at this interlocutory stage of the proceedings below is unnecessary and improper.

Respondents offer three final rebuttals to Petitioners' arguments: first, the Seventh Amendment and Maryland Constitution do not preclude bifurcation of common liability issues from individual issues such as damages, specific causation, or reliance. Secondly, the Circuit Court properly concluded that total amounts of punitive damages or punitive damages multipliers can be determined as a common issue prior to and separately from findings of specific liability and actual dam-

ages. Thirdly, the Circuit Court was correct in judging that Respondents' claim for medical monitoring was both cognizable in Maryland and appropriate for class certification as equitable relief under Rule 2–231(b)(2).

## III. Mandamus

■ We shall first address the threshold question of whether this Court has the authority to issue the extraordinary writ of mandamus or prohibition under the circumstances of the present case.[5]

■■ The common law writ of mandamus is an original action and not an appeal. *See Goodwich v. Nolan*, 343 Md. 130, 145, 680 A.2d 1040, 1047 (1996). Historically, this extraordinary writ has been defined, in general, to be a prerogative writ,

> containing a command in the King's name, issuing from the Court of King's Bench, directed to persons, corporations or inferior courts of judicature within the King's dominions, requiring them to do a certain specific act, as being the duty of their office, agreeably to right and justice.

---

**5.** In contrast to the writ of mandamus, the writ of prohibition has generally been defined as a writ issuing to a party commanding that party to *cease* from performing a particular act, duty, or function. *See In re Petition for Writ of Prohibition*, 312 Md. 280, 286, 539 A.2d 664, 667 (1988) (quoting 3 W. Blackstone, Commentaries on the Laws of England 112 (facsimile ed. 1768)). Given the circumstances of *In re Writ of Prohibition*, we observed in that case, "As to which writ should issue in a case of this sort, we are not disposed to engage in common law quibbles about the differences between mandamus and prohibition." *Id.* at 305, 539 A.2d at 676. Nonetheless, within the context of this case, we shall resolve Petitioners' request for an extraordinary writ in terms of mandamus. Should we issue a writ in this case, we will be ordering the Circuit Court not to refrain from action but rather to take action, *i.e.*, to decertify the class action. The writ would therefore most aptly be couched as one of mandamus. Moreover, previously reported Maryland cases involving the writ of mandamus have been more numerous than cases involving the writ of prohibition. *See generally* 2 John Prentiss Poe, Pleading and Practice in Courts of Common Law §§ 708–13, at 664–77 (5th ed. Tiffany 1925). Consequently, the legal principles with respect to mandamus have developed more extensively and enjoy a clarity that is conducive to our resolution of the instant case.

2 JOHN PRENTISS POE, PLEADING AND PRACTICE IN COURTS OF COMMON LAW § 708, at 664 (5th ed. Tiffany 1925) [hereinafter POE]. It "is a summary remedy, for the want of a specific one, where there would otherwise be a failure of justice. It is based upon reasons of justice and public policy, to preserve peace, order and good government." *State v. Graves,* 19 Md. 351, 374 (1863) (citations omitted). *See also Ipes v. Board of Fire Com'rs of Baltimore,* 224 Md. 180, 183, 167 A.2d 337, 339 (1961); *Upshur v. Baltimore City,* 94 Md. 743, 746, 51 A. 953, 954 (1902); POE, *supra,* § 709, at 664.

█ As a prerogative writ, the authority to issue mandamus rests within the sound discretion of the court, but that discretion must "be exercised under the rules long recognized and established at common law." *Hardcastle v. Md. & Del. R.R. Co.,* 32 Md. 32, 35 (1870) (internal quotation marks omitted). In addition, Circuit Courts of this State have been statutorily conferred with the power and discretion they enjoyed under the common law to issue writs of mandamus. *See* Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.) § 3–8A–01 of the Courts and Judicial Proceedings Article.[6] This case, however, does not involve the correctness *vel non* of the issuance of a writ of mandamus by an inferior court. Rather, Petitioners have requested that this Court issue a writ of mandamus in the first instance. Accordingly, we turn to the authority and role of this Court in ruling upon a petition for mandamus.

We initially reject Respondents' contentions (1) that this Court's promulgation of Title 8 of the Maryland Rules, Appellate Review in the Court of Appeals and Court of Special Appeals, effective July 1, 1988, forecloses the issuance of a writ of mandamus by this Court because of the absence of an express provision in the Rules for such; (2) that any appellate review of the present case, if conducted by this Court, must occur by way of a writ of certiorari, necessitating that the case first be noted and pending in the Court of Special Appeals; (3)

---

6. Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.) § 3–8A–01 of the Courts and Judicial Proceedings Article provides, "A court of law has jurisdiction in an action for mandamus."

that the present petition should be denied on the ground of untimeliness; and (4) that a grant of the requested writ would be futile because Petitioners failed to specifically include the Circuit Court's initial order of class certification within their request for relief.

■ First, that Title 8's lack of an express provision for this Court to issue a writ of mandamus does not negate our mandamus authority is beyond debate. As noted above, the writ of mandamus is an original action, not an appeal. *See Goodwich*, 343 Md. at 145, 680 A.2d at 1047. Hence, Title 8's governance of appellate procedure is simply not applicable. Moreover, the extraordinary writ of mandamus in this State originated under the common law and has several times been recognized to remain a common law prerogative of this Court, even in cases subsequent to 1988. *See Doering v. Fader*, 316 Md. 351, 558 A.2d 733 (1989) (confirming this Court's authority under common law to issue writ of mandamus yet ultimately determining writ unnecessary in that case); *Keene Corp. v. Levin*, 330 Md. 287, 623 A.2d 662 (1993) (acknowledging this Court's common law power to issue writ of mandamus but ruling such issuance improper under circumstances therein). Even were Title 8 applicable, there exists a generally accepted principle in construing statutes and court rules that the legislative, or quasi-legislative, derogation of the common law must be made expressly clear. *See, e.g., Robinson v. State*, 353 Md. 683, 693, 728 A.2d 698, 702 (1999); *Lutz v. State*, 167 Md. 12, 15, 172 A. 354, 356 (1934).

Second, for the very reason that a petition for writ of mandamus is not an appeal, any notion that the Court of Special Appeals possesses "primary jurisdiction" in the present matter is equally inapposite. Third, the writ of mandamus is, again, by its very nature an extraordinary form of relief, the request for which is likewise highly unusual, and, as such, the writ is not ordinarily subject to specific time requirements or other like restrictions. In short, a petition for writ of mandamus or prohibition stands on its own and, for the most part, outside the bounds of time. Fourth, the relief sought by

Petitioners is made abundantly clear throughout the numerous pages of the petition itself. Denying the petition on the basis of its failure to specify the Circuit Court's initial order as the one to be vacated would allow the proverbial—and long denigrated—triumph of form over substance.

Judge Adkins, writing for this Court in *In re Petition for Writ of Prohibition*, 312 Md. 280, 539 A.2d 664 (1988), traced the history and nature of mandamus and prohibition at common law, focusing particularly on whether this Court has the power to issue such prerogative writs. Quickly disposing of any notion of an express constitutional or statutory grant of power in this Court to issue these extraordinary writs in Maryland, we held that "we have jurisdiction to issue to an inferior court peremptory writs in aid of our appellate jurisdiction." *Id.* at 305, 539 A.2d at 676. In discussing the possible bases for this Court's power, we said:

> The Maryland Constitution is silent as to any mandamus or prohibition power in this Court. The only general statutory provision dealing with mandamus jurisdiction is Md.Code (1984 Repl.Vol., 1987 Cum.Supp.) § 3–8A–01 of the Cts. & Jud.Proc. Art.; it relates only to the circuit courts. Nor is there any express grant of superintending power to this Court. Whether we have, as the highest court of this State, an inherent superintending or supervisory power over the courts below us in the judicial hierarchy, and whether any such power is implicit in Article IV, § 18 of the Maryland Constitution, are questions we reserve for another day. We need not and do not address them today because we hold that under the circumstances of this case we have the power to issue a writ of mandamus or a writ of prohibition in aid of our appellate jurisdiction.

*Id.* at 292–93, 539 A.2d at 669–70 (footnotes omitted).[7]

■ As we made clear in *In re Writ of Prohibition*, this Court may utilize the writs of mandamus and prohibition as an

---

7. Likewise, because we shall hold that the circumstances of the present case comprise a sufficient basis for the invocation of this Court's power

aid to appellate jurisdiction even though there is no appeal pending in this Court, and even though no appeal is concurrently possible, *see id.* at 301, 539 A.2d at 674, at least where there is some "potentiality" of eventual appellate review by appeal or certiorari, *see id.* at 302–03, 539 A.2d at 675. We concluded that "[i]f the use of a writ is 'necessary to enable . . . [the Court] to exercise appellate jurisdiction' it is in aid of that jurisdiction." *Id.* at 304, 539 A.2d at 675 (quoting *Marbury v. Madison,* 1 Cranch 137, 175, 2 L.Ed. 60, 73 (1803)) (all alterations but first in *In re Writ of Prohibition* ).

In exploring what "in aid of" our appellate jurisdiction entails, we had stated:

"[I]t is manifestly necessary, to the ends of justice, that there should be a power in special cases to suspend proceedings on the matter appealed from. . . . [This power] is necessarily incident to this Court, to preserve the usefulness of its appellate jurisdiction. If it were otherwise, cases might arise in which the appeal would be but as a shadow, pending which the substance might be lost."

*Id.* at 298, 539 A.2d at 672 (quoting *Thompson v. M'Kim,* 6 H. & J. 302, 333 (Md.1825)) (ellipsis in *In re Writ of Prohibition* ). Thus, we recognized that "by making possible the review of a potentially unreviewable question[, mandamus and] prohibition aided the appellate process." *Id.* at 299, 539 A.2d at 673. The exercise of this Court's authority to issue an extraordinary writ was justified by the potential irreparable harm to the moving party and by the need to maintain the integrity of the legal system. *Id.* at 298, 301, 539 A.2d at 672, 674. *See Ipes,* 224 Md. at 183, 167 A.2d at 339 ("[I]n approaching the question concerning the issuance, *vel non,* of the writ, the courts invoke equitable principles to reach the real merits of the controversy between the parties.").

As we proclaimed more generally,

---

to issue a writ of mandamus in aid of our appellate jurisdiction, we need not decide the viability of other possible bases for the exercise of such power and once again leave those questions open.

In Maryland common law mandamus has been described as a prerogative writ "grantable where the public justice of the State is concerned." *Runkel v. Winemiller,* 4 H. & McH. [429,] 449 [ (Gen. Ct. Oct. Term 1799) ]. It is a writ "to prevent disorder, from a failure of justice, where the law has established no specific remedy, and where in justice and good government there ought to be one. . . ." *Id.* at 449.

*In re Writ of Prohibition,* 312 Md. at 307, 539 A.2d at 677.

■ Writing further for the General Court in the case of *Runkel v. Winemiller,* Judge Jeremiah Townley Chase, soon thereafter Chief Judge of the General Court and later Chief Judge of this Court, summarized the purpose and propriety of an appellate court's exercise of mandamus as follows:

[W]hence the inference is plainly deducible, . . . this Court may, and of right ought, for the sake of justice, to interpose in a summary way to supply a remedy where, for the want of a specific one, there would otherwise be a failure of justice.

*Id.* at 449; *accord Legg v. Annapolis,* 42 Md. 203, 226 (1875). Yet, we do recognize that although mandamus allows a court to afford relief where otherwise none would be forthcoming, the converse of that touchstone principle has likewise been generally established:

It is well settled in this State that a writ of mandamus will not be granted where the petitioner has a specific and adequate legal remedy to meet the justice of the particular case and where the law affords [another] adequate remedy.

*Brack v. Wells,* 184 Md. 86, 90–91, 40 A.2d 319, 321 (1944); *see also Gisriel v. Ocean City Elections Board,* 345 Md. 477, 497, 693 A.2d 757, 767 (1997).

■ Furthermore, we believe that, given the procedural context of this case, the party seeking the extraordinary writ must demonstrate a paramount public policy interest sufficient to offset the strongly established preference for adherence to

the final judgment rule.[8] In *Keene*, 330 Md. 287, 623 A.2d 662, this Court recognized that only "extraordinary circumstances" will justify the interlocutory issuance of a writ of mandamus in complex litigation. *See id.* at 291, 623 A.2d at 664. Except for the limited category of exceptions codified in Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.) § 12–303 of the Courts and Judicial Proceedings Article, ordinarily an appeal will lie only from a final judgment and not from an interlocutory order entered in a civil case.[9] "The underlying policy of the final judgment rule is that piecemeal appeals are disfavored." *Cant v. Bartlett*, 292 Md. 611, 614, 440 A.2d 388, 389 (1982); *see also Anderson v. Anderson*, 349 Md. 294, 297, 708 A.2d 296, 298 (1998). Generally barring appellate review until the entry of a final judgment results in a single review of all claims of error throughout an entire proceeding, thus both expediting litigation and conserving judicial and other resources. *See Jolley v. State*, 282 Md. 353, 356, 384 A.2d 91, 93 (1978); *see also Huber v. Nationwide*, 347 Md. 415, 423, 701 A.2d 415, 418–19 (1997) ("[P]iecemeal appeals ... are not consistent with efficient judicial administration.").

 In sum, in deciding whether the present circumstances warrant our exercise of the extraordinary writ of

**8.** There exist myriad cases from this Court discussing the final judgment rule, under which a lower court's judgment or order in a civil case is ordinarily appealable, or otherwise subject to judicial review, only where it settles the rights of the parties involved and concludes the cause of action, or where such review is allowed by statutory or common law exception to the general rule. *See, e.g., Dep't of Social Services v. Stein*, 328 Md. 1, 8–10, 612 A.2d 880, 883–84 (1992) and cases cited therein; Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.) § 12–301 of the Courts and Judicial Proceedings Article.

**9.** In addition to the exceptions codified in Maryland Code (1974, 1998 Repl.Vol., 1999 Supp.) § 12–303 of the Courts and Judicial Proceedings Article, this Court has " 'adopted the so-called "collateral order doctrine," which treats as final and appealable a limited class of orders which do not terminate litigation in the trial court.' " *Dep't of Social Services v. Stein*, 328 Md. 1, 10, 612 A.2d 880, 884 (1992) (quoting *Public Service Comm'n v. Patuxent Valley*, 300 Md. 200, 206, 477 A.2d 759, 762 (1984)). *See also id.* at 10–12, 612 A.2d at 884–85 (discussing elements of collateral order doctrine).

mandamus in aid of our appellate jurisdiction, and in paying heed to Maryland's legal precedent in this area, we must consider the interests of justice and public policy, the protection of the integrity of the judicial system, the general preferability of the final judgment rule, and the adequacy of other available relief. We conclude that in seeking review by writ of mandamus of the Circuit Court's order granting class certification of this case, Petitioners have demonstrated the lack of other available, adequate relief as well as the existence of a paramount public and judicial interest that, together, override the preference for the final judgment rule and justify the issuance of mandamus, in order to protect the integrity of the judicial system in this State.

The litigation plan approved by the Circuit Court in this case necessarily involves the commitment of such an extraordinary amount of the judicial and other resources of the busiest trial court in this State that any subsequent appellate review of the lower court's Class Certification Order is rendered inadequate and ineffective. The earliest possible point at which Petitioners could initially challenge the class certification in ordinary fashion would likely occur well into the future. Judicial review would ordinarily arise only after a fully litigated loss by Petitioners at the conclusion of one of the Phase II trials. "Only when a final judgment is entered, determining liability and assessing damages, will the case, including interim rulings such as the certification of certain issues in the case for determination in a class action, be appealable. . . ." *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1297 (7th Cir.1995). *See also* 2 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 7.38, at 7–111 to 7–113 (3d ed. 1992) ("The question of appealability of initial class determinations and denials is not entirely settled. Generally, it may be said that appeals are normally limited to final decisions on the merits."); 7B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1802, at 464 (2d ed.1986) (explaining that, by application of "the final judgment rule, the class certification question can be reviewed on appeal only after a final judgment on the merits has been entered"

(citations omitted)). Because of the various subclasses that may be required in the present litigation, the number of Phase II trials may amount to a significant total: the six subclasses already proposed to the Circuit Court by Respondents may represent only the beginning of the amount eventually needed to properly prosecute this case as a class action. *See Smith v. Brown & Williamson Tobacco Corp.,* 174 F.R.D. 90, 97–98 (W.D.Mo.1997) (indicating necessity of multiple subclasses and corresponding representatives for each type of disease allegedly caused by defendants' various products as well as for each distinct product and for different time periods). *Cf. Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626–27, 117 S.Ct. 2231, 2251, 138 L.Ed.2d 689 (1997) (in settlement-only asbestos class action context, emphasizing need for discrete subclasses to ensure fair and adequate representation for diverse groups and individuals affected).[10]

Moreover, appellate review of the class certification may actually have to await a trial loss by Petitioners during Phase III. Only then might the class certification itself constitute an appealable issue because the named class plaintiffs' representation of absent class members under the proposed litigation plan is incomplete. Even after a victory by the class or subclass *representative* during Phase II, each respective class or subclass *member* must still prevail during Phase III on his or her own individual issues related to specific liability and compensatory damages. The potential harm of this scenario is substantially exacerbated by the possibly inordinate size of the class membership in this case: Respondents have averred that "[a]n estimated 732,000 Maryland adults smoke cigarettes," that "[t]housands of adolescents begin smoking for the first time every day" and that "[t]housands more Maryland residents use smokeless [t]obacco [p]roducts." (Plaintiffs' Fourth Amended Complaint at ¶ 44) [hereinafter Pls.' 4th Am.

---

**10.** Consistent with this principle, the Circuit Court, as already noted, *see supra* note 3, has indicated that, at the least, the "one subclass of people with smoking-related diseases ... would be further divided into subclasses for the [twelve] different diseases [Respondents] claim are caused by smoking." (Cir. Ct. Mem. Op. at 3 n. 3.)

Compl.].[11] It is not feasible at this point to determine, from any numbers now—or made—available, what persons within these groups would qualify as injured by or addicted to Petitioners' tobacco products. Suffice it to say, however, that the potential number of Phase III trials, as these estimates now stand, is daunting indeed.

In the interim, judicial and other resources would be expended upon the following: discovery skirmishes, motions *in limine*, legal disputes over Maryland and probably foreign law, preparation for litigation, litigation, and a host of other unforeseeable conflicts between two well-represented, adverse and resourceful parties. We emphasize this case does not equate with garden variety class action litigation. The waste of judicial and other resources, should the Circuit Court's Class Certification Order be overturned on appeal only after a Phase II or Phase III verdict, would be without precedent in this State.

 No citation to authority is required for us to note the crowded dockets in the Circuit Courts of this State; this is especially true in the Circuit Court for Baltimore City, where this litigation is scheduled to occur. We have explained before, albeit in a different context, that an order which has the direct effect of terminating litigation is an important issue, even if that order involves only a single litigant. *See Clark v. Elza*, 286 Md. 208, 213, 406 A.2d 922, 925 (1979). *See also CSR Limited v. Link*, 925 S.W.2d 591, 596 (Tex.1996) ("The most efficient use of the state's judicial resources is another factor we consider in determining whether an ordinary appeal would provide an adequate remedy."). That equation increas-

---

11. No estimate of pinpoint accuracy as to the potential number of class members is available, of course. We nonetheless take note that according to the Class Action Notice Plan, issued in conjunction with the Circuit Court's Class Certification Order of February 19, 1998, the number of adult citizens in Maryland in 1993 totaled 3,619,227, 20.4% of whom were estimated to be smokers, that is, 738,322. The number of adult users of smokeless tobacco in Maryland, on the other hand, was figured to be 0.7% of the total population, or 25,335. Similar figures for non-adults in Maryland, however, are not provided within the record.

es exponentially when the litigation is as complex as that approved by the Class Certification Order in this case. As one California court has recognized, "Relief by mandamus is appropriate where it will prevent a needless, expensive trial and an ultimate reversal." *City of Huntington Beach v. Superior Court,* 78 Cal.App.3d 333, 144 Cal.Rptr. 236, 239 (1978). *See also Blue Chip Stamps v. Superior Court,* 18 Cal.3d 381, 134 Cal.Rptr. 393, 556 P.2d 755, 759 (1976) (issuing writ of mandamus to vacate class certification order where, as matter of law, proposed methods of recovery by plaintiffs did not correspond to damages originally suffered); *City of Glendale v. Superior Court,* 18 Cal.App.4th 1768, 23 Cal.Rptr.2d 305, 310 (1993).[12]

Given the judicial and other resources that would be irrevocably wasted should the Circuit Court's Class Certification Order not be overturned until after a Phase II or Phase III judgment, we will not permit this case to proceed that far if we are convinced presently that reversal of the Class Certification Order is mandated. In ruling interlocutory judicial review of a lower court's class certification proper because of the existence of irreparable harm, a Louisiana intermediate appellate court characterized that harm as follows:

"[I]f, at a later time, after trial on the merits and review, it is determined that the trial judge erred in permitting the matter to be tried as a class action, immeasurable expense and innumerable wasted court days will have resulted. Furthermore, litigants in other matters will have been needlessly delayed."

*Hampton v. Illinois Central RR Co.,* 730 So.2d 1091, 1093 (La.Ct.App.1999) (quoting *State ex rel. Guste v. General Mo-*

---

**12.** Respondents urge that we view California cases regarding mandamus as wholly distinguishable because of the fact that California appellate courts are explicitly granted, by statute, broad authority to issue writs of mandamus, referred to as writs of "mandate," to inferior courts. *See* Cal.Civ.Proc.Code § 1085(a) (West 2000). We emphasize that our citations to the California cases go not to the issue of whether this Court has authority to issue a writ of mandamus to the Circuit Court but whether we ought to issue the writ under the present circumstances.

*tors Corp.,* 354 So.2d 770, 774 (La.Ct.App.1978)). The same harm is portended in the present case as it now stands before us.

Both the public interest and our responsibility in exercising the supreme judicial authority of this State thus compel the exercise of this Court's discretion in this extraordinary case. As cogently stated by the Supreme Court of Tennessee,

[W]hile mandamus relief is rarely justified, there is ample authority for the issuance of the writ to correct a class certification upon a clear showing that the trial court has committed legal errors or abused its discretion and no other adequate remedy is available. The conclusion is that *in extraordinary cases,* including class actions, this Court may, and properly should, issue a writ of mandamus if that action is necessary to protect its jurisdiction or accomplish substantial justice.

*Meighan v. U.S. Sprint Communications Co.,* 942 S.W.2d 476, 483 (Tenn.1997) (emphasis added).

There is substantial public interest in a timely resolution of the issue central to Petitioners' request for a writ of mandamus. The legal propriety of certifying a class action in the present case, whose logistical magnitude alone is staggering and which concomitantly may significantly impact or divert the public resources earmarked for the judiciary for the next several years, calls for this Court's earlier than usual attention. In this regard, we credit another court's observation under similar circumstances:

The fact that it is in the public interest to resolve this controversy as expeditiously as possible tends to weigh in favor of the exercise of our discretion to consider the petition for writ of mandate, rather than requiring the [plaintiff] to await a later appeal.

*City of Oakland v. Superior Court,* 45 Cal.App.4th 740, 53 Cal.Rptr.2d 120, 127 (1996); *see also In re Bendectin Prods. Liab. Litig.,* 749 F.2d 300, 307 (6th Cir.1984) ("[T]he sheer magnitude of the case makes the disposition of these issues crucial as several hundred litigants are waiting for a decision

before proceeding with their cases."); *City of Huntington Beach,* 144 Cal.Rptr. at 239. Indeed it would seem more prudent to risk premature intervention on our part rather than hedge our bets on involvement that may simply be too late. The truly extraordinary circumstances of the present case warrant our extraordinary attention at this time, and would justify our grant of the extraordinary relief requested, should we determine the Circuit Court's judgment to be in error or an abuse of discretion.

Respondents, as well as the dissenters, would have us stay our hand and ignore our authority on the basis that the Circuit Court's Class Certification Order retains a full degree of conditionality, revisibility, and reversibility. *See* Maryland Rule 2–231(c).[13] It is urged that the lower court be allowed to cure on its own any error embodied within the order or by the order itself before being subjected to judicial review. Again, we are not unaware of the procedural posture of this case nor of the ordinary preferability of awaiting a final judgment before commencing such review. Nevertheless, we remain convinced that the extraordinary circumstances of the instant litigation and its current status as a class action necessitate that we conduct our review at this earlier than normal juncture, despite that the existing order "may be conditional," *id. Cf. Castano v. American Tobacco Co.,* 84 F.3d 734, 741 (5th Cir.1996) (indicating that the requirements for class certification are not relaxed or "lessened" merely because the trial court declares the certification conditional); *In re Hotel Tel. Charges,* 500 F.2d 86, 90 (9th Cir.1974).[14] The writ of manda-

---

**13.** The Maryland class action rule, codified under Maryland Rule 2–231, is reproduced and discussed at length *infra* Section IV. As to the present issue, Maryland Rule 2–231(c) provides that a class action certification order "may be conditional and may be altered or amended before a decision on the merits."

**14.** The Ninth Circuit has characterized the insulation afforded to a trial court's class certification order by the conditionality thereof as rather limited:

Conditional certification is not a means whereby the District Court can avoid deciding whether, at that time, the requirements of the

mus not only enables us to exercise our prerogative under these circumstances, but it is indeed for such rare circumstances as these that the writ grants us the authority to intervene in the first place.

Finally, Respondents have emphasized in contrast what we stated seven years ago,

> Although the normal appellate process may not produce as swift and inexpensive a result as would the issuance of a writ of mandamus, we are not persuaded that the cost and delay attendant to following normal procedures will so prejudice the litigants as to justify the issuance of an extraordinary writ.

*Keene,* 330 Md. at 294, 623 A.2d at 666. We, however, view the extraordinary circumstances of the present case in a wholly different light. Indeed, we recognize that the parties will incur significant costs and delays if mandamus relief is not granted and appellate review of the Circuit Court's Class Certification Order is denied until the entry of a final judgment either at the conclusion of Phase II or during Phase III of the proposed class litigation. Should such expenses have been endured on account of a judgment by the Circuit Court that suffers from underlying legal error or an abuse of discretion, they would be losses as monumental in their unfairness as in their sheer amount. *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1004 (11th Cir.1997) (" 'The only conceivable alternative [to mandamus relief]—inevitable reversal by this court after the defendants have been forced to endure full discovery, full litigation, and a full trial—is scarcely · adequate' to redress this injury." (Quoting *In re Cooper,* 971 F.2d 640, 641 (11th Cir.1992)) (alteration in *Jackson* )).

---

[federal class action] Rule have been substantially met. The purpose of conditional certification is to preserve the Court's power to revoke certification in those cases wherein the magnitude or complexity of the litigation may eventually reveal problems not theretofore apparent.

*In re Hotel Tel. Charges,* 500 F.2d 86, 90 (9th Cir.1974). We believe that whatever problems the Circuit Court's certification of the present litigation as a class action may. entail, they are hardly unrevealed; instead, they are readily apparent.

*See also Blue Chip Stamps,* 134 Cal.Rptr. 393, 556 P.2d at 759 n. 4 ("Petitioners have no adequate remedy by appeal from final judgment. Delaying review until final judgment—while the trial court attempts to manage the unmanageable—would mean that the parties could not obtain appellate review until after they had paid the great costs which render the damage action inappropriate. Thus, appeal from a final judgment is not a practical remedy.").

In similar vein, some courts have expressed concern that granting class certification significantly increases the pressure on a risk-adverse defendant to settle pending class claims rather than face the threat of an exceptional award of damages. *See Castano,* 84 F.3d at 746 (in describing so-called "judicial blackmail settlements," stating, "In addition to skewing trial outcomes, class certification creates insurmountable pressure on defendants to settle, whereas individual trials would not. The risk of facing an all-or-nothing verdict presents too high a risk, even when the probability of an adverse judgment is low." (citation omitted)); *Rhone–Poulenc,* 51 F.3d at 1297 ("The reason that an appeal will come too late to provide effective relief for these defendants is the sheer *magnitude* of the risk to which the class action ... exposes them."). *Cf. Jackson,* 130 F.3d at 1004 (recognizing "the danger of abuse that always attends class communications—the possibility that plaintiffs might use widespread publication of their claims, disguised as class communications, to coerce defendants into settlement"). Should similar undue pressure be thrust upon Petitioners here, owing to a determination by the Circuit Court that is erroneous or abusive of its discretion, the injustice would be equally attributable to this Court for hesitating to exercise a discretion, however extraordinary in nature, with which we are not so much empowered as we are charged.

For all the reasons discussed above, we hold that the extraordinary writ of mandamus may appropriately issue under the circumstances of the present case. In doing so, we reaffirm our commitment to the principles underlying the final judgment rule and our adherence, ordinarily, to the rule itself.

*See In re American Medical Systems, Inc.*, 75 F.3d 1069, 1077 (6th Cir.1996) (noting that the writ of mandamus "provides some flexibility in instances where rigid enforcement of the final judgement rule would result in injustice"). Our holding is limited necessarily to the unique factual circumstances and procedural nature of this case. It will be the rare case indeed which justifies the issuance of interlocutory mandamus relief, although we need not flesh out that framework today. Writing for this Court over a century ago, Chief Judge McSherry recognized the importance of an appellate court's speaking only to the controversy then before it:

> [A]s we had no such question to decide we deemed it wholly unnecessary to step aside a single pace from the straight path before us, and declare what particular appointments were *not* included within the scope of our decision. The duty of a Court is done, as we apprehend, when it decides the case before it, and it is obviously no part of that duty to declare that the Court has *not* decided something wholly different; or to enumerate, in anticipation of possible future contests the instances in which, by reason of a difference of facts, the opinion would not be applicable.

*Hooper v. New*, 85 Md. 565, 573, 37 A. 424, 425 (1897). We simply hold that, given the irreparable harm that might otherwise be suffered by the legal system and by Petitioners, we may issue a writ of mandamus in aid of our appellate jurisdiction in the present matter. It is appropriately within this Court's prerogative to review the order of the Circuit Court granting class certification in this case so extraordinary because of the immense amount of time and expense that both the parties and the judicial system of this State will incur should the litigation proceed as a class action, as well as the astronomical number of persons in Maryland whose lives will be affected by our decision either way.

## IV. Merits of the Class Certification Order

### A. General Principles

We now turn to the merits of the Circuit Court's decision to certify two classes of Maryland residents injured by or addict-

ed to tobacco products. Maryland Rule 2–231 governs class certification and provides in pertinent parts as follows:

(a) *Prerequisites to a class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class actions maintainable.* Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any

litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, (D) the difficulties likely to be encountered in the management of a class action.

(c) *Certification.* On motion of any party or on the court's own initiative, the court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action. A hearing shall be granted if requested by any party. The order shall include the court's findings and reasons for certifying or refusing to certify the action as a class action. The order may be conditional and may be altered or amended before the decision on the merits.

(d) *Partial class actions; subclasses.* When appropriate, an action may be brought or maintained as a class action with respect to particular issues, or a class may be divided into subclasses and each subclass treated as a class.

There is a dearth of authority in Maryland analyzing the specific requirements of Maryland Rule 2–231. We need not consider the application of these requirements in a void, however, as there exists an abundance of cases from other jurisdictions, federal and state, that have analyzed class action rules either identical to or similar to Maryland's rule. *See Jackson v. State,* 340 Md. 705, 716, 668 A.2d 8, 13–14 (1995) (noting that when federal rule of evidence contains same language as Maryland rule of evidence, court may look to former when interpreting latter); *Garay v. Overholtzer,* 332 Md. 339, 355, 631 A.2d 429, 437 (1993) (reiterating that where Maryland rule essentially tracks federal rule, interpretations of that federal rule are persuasive as to meaning and proper applications of the Maryland rule); *Beatty v. Trailmaster,* 330 Md. 726, 738 n. 8, 625 A.2d 1005, 1011 n. 8 (1993). *See also Pollokoff v. Maryland Nat'l Bank,* 44 Md.App. 188, 192, 407 A.2d 799, 801 (1979) (treating federal rule on class actions as persuasive authority in interpreting Maryland rule on class actions), *aff'd,* 288 Md. 485, 418 A.2d 1201 (1980).

The United States Supreme Court has reviewed the federal class action rule, namely, Rule 23 of the Federal Rules of Civil Procedure [hereinafter Federal Rule 23],[15] on a number of occasions, most recently in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). *See also General Tel. Co. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Likewise, numerous federal appellate and trial courts have applied the federal class action rule in a variety of contexts, including that of mass tort tobacco litigation. *See, e.g., Barnes v. American Tobacco Co.*, 161 F.3d 127 (3rd Cir.1998); *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996); *In re American Medical Systems, Inc.*, 75 F.3d 1069 (6th Cir.1996); *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir.1995); *Insolia v. Philip Morris Inc.*, 186 F.R.D. 535 (W.D.Wis.1998); *Emig v. American Tobacco Co.*, 184 F.R.D. 379 (D.Kan.1998).

---

**15.** The federal class action rule provides in pertinent part:

Rule 23. Class Actions

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \* \* \* \*

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED.R.CIV.P. 23(a), (b)(3). As can readily be seen, the federal class action rule is quite similar to Maryland Rule 2–231.

Finally, a small number of courts in other States and the District of Columbia has also interpreted the same or similar class action rules in contexts apposite to the present case. *See, e.g., Reed v. Philip Morris Inc.,* Civil No. 96–5070, slip op. (D.C.Super.Ct. July 23, 1999) (*Reed II* ); *Reed v. Philip Morris Inc.,* Civil No. 96–5070, 1997 WL 538921 (D.C.Super.Ct. Aug. 18, 1997) (*Reed I* ); *Geiger v. American Tobacco Co.,* 181 Misc.2d 875, 696 N.Y.S.2d 345 (N.Y.Sup.Ct.1999).[16] We shall look to these cases, and others, to aid our analysis in determining whether the Circuit Court abused its discretion in certifying this case for class action treatment and whether the court applied the correct legal standards in reaching its decision. *See Washington v. CSC Credit Services, Inc.,* 199 F.3d 263, 265 (5th Cir.2000) (stating that "[w]e review the district court's decision to certify the class for an abuse of discretion" but that "we review *de novo* whether the district court applied the correct legal standard to grant certification" (citing *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 408 (5th Cir. 1998))), *petition for cert. filed,* No. 99–1623 (Apr. 6, 2000).

The plain language of Rule 2–231 sets forth several prerequisites that must be satisfied before a Circuit Court may certify a class. *See Falcon,* 457 U.S. at 161, 102 S.Ct. at 2372 (stating that, before certifying class, district court must conduct rigorous analysis of Federal Rule 23 prerequisites). The party moving for class certification bears the burden of proving that the requirements for certification have been met. *See American Medical Systems,* 75 F.3d at 1079. A court should accept the putative class representative plaintiffs' allegations as true in making its decision on class certification, *see Emig,* 184 F.R.D. at 385, and the determination may not be rested upon the merits of the underlying cause(s) of action, *see Eisen,* 417 U.S. at 177–78, 94 S.Ct. at 2152; *Emig,* 184 F.R.D.

---

**16.** The Court of Appeals of New York has stated that "New York's class action statute (CPLR 901–909) has much in common with Federal [R]ule 23. The prerequisites to the filing of a New York class action are virtually identical to those contained in [R]ule 23." *In re Colt Indus. Shareholder Litig.,* 77 N.Y.2d 185, 565 N.Y.S.2d 755, 566 N.E.2d 1160, 1165 (1991) (citations omitted).

at 384. Nevertheless, "the court can go beyond the pleadings to the extent necessary to 'understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Emig,* 184 F.R.D. at 384 (quoting *Castano,* 84 F.3d at 744 (in turn citing MANUAL FOR COMPLEX LITIGATION § 30.11, at 214 (3d ed.1995))). *See also Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372 (indicating that trial court may need to "probe behind the pleadings" to determine propriety of class certification).

In accordance with the procedure outlined in Rule 2–231, for any case properly to be certified as a class action, four initial prerequisites must be satisfied: numerosity (the class is so numerous that joinder of all members is impracticable); commonality (there are questions of law or fact common to the class); typicality (the claims or defenses of the representative parties are typical of the claims or defenses of the class); and adequacy of representation (the representative parties and counsel will fairly and adequately protect the interests of the class).

The prerequisites of Rule 2–231(a) are necessary but not sufficient conditions for a class action. *See* FED.R.CIV.P. 23, Advisory Committee Note to 1966 Amendments, *reprinted in* 39 F.R.D. 69, 100 (1966) [hereinafter Federal Rule 23 Committee Note]. Besides meeting the four requirements thereunder, the proposed class or classes must also satisfy one of the three subsections of Rule 2–231(b). *See Amchem,* 521 U.S. at 614, 117 S.Ct. at 2245 (declaring that in addition to satisfying federal class action rule's threshold requirements, "parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)"). The Circuit Court certified this class action under Rule 2–231(b)(3), with the exception of the medical monitoring claim, which the court certified under Rule 2–231(b)(2).[17] Under Rule 2–231(b)(3), a court must find predominance (questions of law or fact common to the members of the class predominate over any

---

**17.** We shall discuss the Circuit Court's certification of the medical monitoring claim for treatment as a class action *infra* Section VI.

questions affecting only individual members) and superiority (a class action is superior to other available methods for the fair and efficient adjudication of the controversy), standards which also comprise prerequisites to certifying a class action under Federal Rule 23(b)(3). As the Advisory Committee Note to the 1966 amendments of the federal rule indicates, these standards jointly reflect a pragmatic goal: "Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Federal Rule 23 Committee Note, *supra,* 39 F.R.D. at 102–103; *see also Insolia,* 186 F.R.D. at 545; *Arch v. American Tobacco Co.,* 175 F.R.D. 469, 485 (E.D.Pa.1997). Accordingly, class action status should not be conferred upon cases that "would degenerate in practice into multiple lawsuits separately tried," Federal Rule 23 Committee Note, *supra,* 39 F.R.D. at 103.

Before we proceed to apply the specific requirements of Rule 2–231 to the case at hand, we think it important to address another oft-cited comment that seems to shed some doubt on the appropriateness of the class action vehicle for mass tort litigation, including, perhaps, the sort involved here:

A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

*Id.* Although some courts have adhered strictly to this commentary and refused to certify mass tort class actions, many other courts have, when appropriate, certified classes in mass tort litigation. *See Castano,* 84 F.3d at 746 and 746–47 n. 23 (observing that "historically, certification of mass tort litigation classes has been disfavored" and comparing cases granting class certification in mass tort context with those denying

such). For its part, the United States Supreme Court has placed some stock in the enduring vitality of the commentary, explaining that the "Committee's warning . . . continues to call for caution when individual stakes are high and disparities among class members great." *Amchem,* 521 U.S. at 625, 117 S.Ct. at 2250.

More or less independently of the debate over the 1966 Advisory Committee Note, the parties before this Court dispute the existence *vel non* of a recent trend, within the last decade or so, disfavoring class actions in mass tort cases. It is a dispute that we need not directly weigh in on, however, as we shall abide by the view that courts should decide whether to certify a class action in mass tort litigation on a case-by-case basis. *See Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1230 (9th Cir.1996) (acknowledging that the 1966 Advisory Committee Note "cast[s] doubt on the availability of class actions in mass tort cases," but also noting that courts have nevertheless "generally proceeded on a case-by-case basis and considered the appropriateness of class action treatment under the particular circumstances presented"); *Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 473 (5th Cir.1986) (noting that courts have ordinarily avoided class actions in the mass tort setting, but observing that "the courts are now being forced to rethink the alternatives and priorities by the current volume of litigation and more frequent mass disasters"). *See also* 3 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 17.05 (3d ed.1992).

Although we shall not decide the propriety of the lower court's class certification of the present action on the basis of some generalized or proposed approach to mass tort litigation, we are nonetheless cognizant of an irrefutable trend that is both more particular and more closely related to the instant case. A myriad of federal and state courts have shown a predominant, indeed almost unanimous reluctance to certify, or, in the case of appellate courts, to uphold the certification of class actions for mass tobacco litigation. Moreover, this aversion bears out regardless of (1) whether the plaintiffs represented a putative class membership that was nationwide or

one that was restricted to a singular forum state, (2) whether the filed lawsuit presented multifaceted causes of action, more streamlined complaints, or even a single claim, and (3) whether the relief sought was comprised of compensatory damages, punitive damages, injunctive remedies, or a combination thereof. *See Castano,* 84 F.3d 734; *Thompson v. American Tobacco Co.,* 189 F.R.D. 544 (D.Minn.1999); *Hansen v. American Tobacco Co.,* No. LR–C–96–881, 1999 U.S. Dist. LEXIS 11277 (E.D.Ark. July 31, 1999); *Clay v. American Tobacco Co.,* 188 F.R.D. 483 (S.D.Ill.1999); *Chamberlain v. American Tobacco Co.,* 70 F.Supp.2d 788 (N.D.Ohio 1999); *Insolia,* 186 F.R.D. 535; *Emig,* 184 F.R.D. 379; *Barreras Ruiz v. American Tobacco Co.,* 180 F.R.D. 194 (D.P.R.1998); *Barnes v. American Tobacco Co.,* 176 F.R.D. 479 (E.D.Pa.1997), *aff'd,* 161 F.3d 127 (3rd Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); *Lyons v. American Tobacco Co.,* Case No. Civ. A. 96–0881–BH–S, 1997 WL 809677, 1997 U.S. Dist. LEXIS 18365 (S.D.Ala. Sept. 30, 1997); *Arch,* 175 F.R.D. 469;[18] *Walker v. Liggett Group, Inc.,* 175 F.R.D. 226 (S.D.W.Va.1997); *Smith v. Brown & Williamson Tobacco Corp.,* 174 F.R.D. 90 (W.D.Mo.1997); *In re Tobacco Cases II,* No. JCCP–4042, slip op. (San Diego County, Cal.Super. Ct. Apr. 10, 2000); *Reed II,* Civil No. 96–5070, slip op. (D.C.Super.Ct. July 23, 1999); *Reed I,* Civil No. 96–5070, 1997 WL

---

**18.** *Barnes v. American Tobacco Co.,* 176 F.R.D. 479 (E.D.Pa.1997), *aff'd,* 161 F.3d 127 (3rd Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999), and *Arch v. American Tobacco Co.,* 175 F.R.D. 469, 485 (E.D.Pa.1997), actually involve the same litigation, just at different stages. After the trial court denied plaintiffs' motion for class certification in *Arch,* on June 3, 1997, the plaintiffs amended their complaint to incorporate only a claim for medical monitoring, plaintiff Arch withdrew from the lawsuit, and plaintiff Barnes became the lead plaintiff. *See Barnes,* 176 F.R.D. at 482 and 482 n. 1. On August 22, 1997, the trial court granted the *Barnes* plaintiffs' subsequent motion for class certification. *See id.* at 493. Shortly thereafter, however, on October 17, 1997, the trial court decertified the class pursuant to Federal Rule of Civil Procedure 23(c)(1) after determining that "the individual issues implicated by the [more fully developed] facts and circumstances of this case preclude continuing this case as a class action." *Id.* at 502. The Third Circuit then affirmed the trial court's decertification. *See Barnes,* 161 F.3d at 149.

538921 (D.C.Super.Ct. Aug. 18, 1997); *Taylor v. American Tobacco Co.,* No. 97 715975 NP, slip op. (Wayne County, Mich. Cir. Ct. Jan. 10, 2000); *Cosentino v. Philip Morris Inc.,* No. MID–L–5135–97, slip op. (N.J.Super. Ct. Oct. 22, 1998, *recon.,* Feb. 11, 1999); *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 679 N.Y.S.2d 593 (1998), *aff'd,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999); *Geiger,* 181 Misc.2d 875, 696 N.Y.S.2d 345. *See also* Note, *Decertification of Statewide Tobacco Class Actions,* 74 N.Y.U. L.Rev. 1336, 1364–75 (1999) (arguing against certification of so-called "son of Castano" suits as class actions in state or federal courts); Comment, *Forcing Round Classes Into Square Rules: Attempting Certification of Nicotine Addiction–As–Injury Class Actions Under Federal Rule of Civil Procedure 23(B)3,* 29 U. Tol. L.Rev. 699, 718–26 (1998) (contending that products liability class actions based upon nicotine addiction-as-injury cannot qualify under Federal Rule 23(b)(3)). *But see R.J. Reynolds Tobacco Co. v. Engle,* 672 So.2d 39 (Fla.Dist.Ct.App.1996), *rev. denied,* 682 So.2d 1100 (Fla.1996); *Scott v. American Tobacco Co.,* 725 So.2d 10 (La.Ct.App.1998), *writ denied,* 731 So.2d 189 (La.1999);[19] Mark C. Weber, *Thanks for Not Suing: The Prospects for State Court Class Action Litigation Over Tobacco Injuries,* 33

---

**19.** The only other case of tobacco litigation that our research has uncovered in which a court's certification of the suit as a class action prevailed was that of *Iron Workers Local Union No. 17 Insurance Fund and Trustees v. Philip Morris Inc.,* 182 F.R.D. 523 (N.D.Ohio 1998). There the federal trial court certified as a class action a suit brought by a host of employee health benefits funds against tobacco manufacturers and distributors, based upon claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), the Ohio Pattern of Corrupt Activity Act, and federal and state antitrust laws, in which plaintiffs sought recovery for extra medical costs incurred in treating insured patients with tobacco disorders, and where classwide damages were to be proven through expert testimony using a statistical computation model. The trial court thereafter rejected defendants' motion to certify the class action ruling for interlocutory review, *see Iron Workers Local Union No. 17 Insurance Fund and Trustees v. Philip Morris Inc.,* 29 F.Supp.2d 825 (N.D.Ohio 1998). Appellate review of the class certification, however, was rendered unnecessary by a jury verdict in complete favor of the defendants. *See Iron Workers Local Union No. 17 Insurance Fund and Trustees v. Philip Morris Inc.,* 186 F.R.D. 453, 454 (N.D.Ohio 1999).

GA. L. REV. 979, 990–1020 (1999) (generally asserting that "carefully framed" tobacco liability suits can properly be maintained as class actions in state courts and, with "proper qualifications," should be).

We shall now turn to the specific prerequisites for prosecuting a class action lawsuit in Maryland, for purposes of assessing the appropriateness of the Circuit Court's Class Certification Order in the present matter.

## B. Numerosity

■■■ The first requirement of Maryland Rule 2–231 is that the class be so numerous that joinder of all members is impracticable. The purpose of the numerosity requirement is to ensure that there is a need for the class action; if joinder of the actions is practicable, then the class action device is unnecessary. *See* 1 HERBERT NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS, § 3.01, at 3–4 (3d ed.1992) [hereinafter 1 NEWBERG]. This requirement helps to promote the objectives of judicial economy and access to the legal system, particularly for persons with small individual claims. *See id.* at 3–12 to 3–13. Whether numerosity is met depends on a court's practical judgment, given the facts of a particular case. *See General Telephone Co. of the Northwest v. E.E.O.C.*, 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980) ("The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."); 1 NEWBERG, *supra*, § 3.05, at 3–26. Plaintiffs need not state a number with specificity; a good faith estimate is ordinarily sufficient. *See id.* at 3–18 to 3–19; 7A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1762, at 153 (2d ed.1986) [hereinafter 7A WRIGHT, MILLER, & KANE]. Finally, a class consisting of hundreds, or thousands, of members is likely to satisfy this requirement. *See* 1 NEWBERG, *supra*, § 3.05, at 3–23 to 3–24.

■■■ When the Circuit Court for Baltimore City consolidated the cases involved in the well-known asbestos litigation that inundated the City and State in the late 1980's and early

1990's, there were thousands of individual asbestos cases pending in that court, and thousands more pending in other Circuit Courts throughout the State. *See ACandS, Inc. v. Godwin,* 340 Md. 334, 341–43, 667 A.2d 116, 119–20 (1995). In the present litigation, Petitioners have opined that, at the time the motion for certification was filed, the four class representatives in this litigation represented the only pending tobacco litigation in Maryland. Nevertheless, Respondents have estimated that if this class action were to proceed, the number of people joining the litigation would far exceed the number of people involved in the asbestos litigation and have offered a good faith estimate of "tens of thousands of Maryland citizens." (Plaintiffs' Motion for Class Certification at 35). Petitioners likewise have stated that the litigation "will impact the claims of potentially hundreds of thousands of Maryland residents." (Defendants' Objections to Plaintiffs' Proposed Class Definition at 7).[20] Moreover, Petitioners did not contest numerosity before the Circuit Court, nor do they here. We consequently agree with the trial judge that the numerosity requirement of Rule 2–231(a) is satisfied in the present case.

## C. Commonality

We must next review the Circuit Court's determination as to whether there are questions of law or fact common to the classes. The lower court found that Respondents' case presents several common questions, including whether cigarettes and smokeless tobacco products are addictive; whether Petitioners have manipulated nicotine levels in their products; whether Petitioners intentionally conspired to conceal and distort the results of tobacco research; whether certain affirmative defenses are available to Petitioners; and whether the conduct of Petitioners supports the imposition of punitive damages under Maryland law.[21]

---

**20.** As to more specific estimates of the number of class action members who may potentially be involved in the instant case, see *supra* note 11.

**21.** Without specifically finding each of them to be issues common to the class members, the Circuit Court highlighted the following from Re-

The commonality requirement promotes "[c]onvenience, uniformity of decision, and judicial economy," because common issues are litigated "only once on behalf of all class members." 1 NEWBERG, *supra,* § 3.01, at 3–4. The threshold of commonality is not a high one and is easily met in most cases. *See Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 472 (5th Cir.1986); 1 NEWBERG, *supra,* § 3.10, at 3–50. It "does not require that all, or even most issues be common, nor that common issues predominate, but only that common issues exist."· *Central Wesleyan College v. W.R. Grace & Co.,* 143 F.R.D. 628, 636 (D.S.C.1992), *aff'd,* 6 F.3d 177 (4th Cir.1993); *see also Baby Neal v. Casey,* 43 F.3d 48, 56 (3rd Cir.1994) (requiring only that the named plaintiffs share at least one question of fact or law with the grievances of the prospective class). Although the standard for commonality varies among jurisdictions, a common articulation requires that the lawsuit exhibit a "common nucleus of operative facts." *Insolia v. Philip Morris Inc.,* 186 F.R.D. 535, 542 (W.D.Wis.1998); *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992); *cf.* 7A WRIGHT, MILLER, & KANE, *supra,* § 1778, at 528.

We had occasion to analyze a commonality requirement similar to that of Rule 2–231(a)(2) during our review of the consolidated asbestos litigation. In *ACandS, Inc. v. Godwin,* 340 Md. 334, 667 A.2d 116, we affirmed the trial court's decision to hold a Phase I trial on common issues. Judge Rodowsky, writing for the Court, stated:

---

spondents' list of fifty-three arguably common questions as proffered in their Fourth Amended Complaint:

whether tobacco is addictive; whether [Petitioners] have manipulated nicotine levels in their products; whether [Petitioners] have concealed research showing nicotine to be addictive; whether tobacco causes disease and if so, whether the [Petitioners] have intentionally concealed and distorted research data; whether prior to 1969 the industry failed to warn the public of the dangers known to the industry regarding smoking; whether the tobacco industry has produced a defective product and if so, whether they are strictly liable; whether a safer alternative design was and is available, and if so, whether the industry has intentionally disregarded the alternative design to continue marketing a defective, addictive product.

(Cir. Ct. Mem. Op. at 33 n. 13); *see also* (Pls.' 4th Am. Compl. at ¶ 45).

The defendants submit that the 8,555 plaintiffs in the consolidation have different occupations, were exposed at different times, at different workplaces, have different diseases, and different medical histories. But none of these factors diminishes the commonality of the Phase I issues, and the Phase I determinations are the only determinations that will be applied against the defendants-appellants at mini-trials of the other plaintiffs' actions.

Issues involving a plaintiff's burden on state of the art in an asbestos products liability failure to warn case are particularly appropriate for consolidation. Absent unusual circumstances, it is senseless to repeat the presentation of the same evidence against the same defendants in successive, individual trials or mini-consolidations.

*Id.* at 395, 667 A.2d at 146.

Although the instant lawsuit differs significantly from the asbestos litigation, we believe that the *Godwin* court's analysis of common issues is relevant here. The commonality requirement does not ask us to assess the common issues vis-à-vis individual issues, but only to ask whether common issues exist. Many of Respondents' allegations focus on fraudulent conduct and concealment, actions which vary little, if at all, from plaintiff to plaintiff. As in the asbestos litigation, "the same medical studies, medical journal articles, workers' compensation claims, third-party suits, depositions of witnesses, transcripts of court testimony, minutes of meetings, correspondence, and other exhibits are produced against the same defendants in [lawsuit] after [lawsuit] throughout the nation." *Id.* at 395–96, 667 A.2d at 146. Indeed, as plaintiffs in any case alleging claims of fraudulent activity and misrepresentation on the part of tobacco manufacturers as well as charges regarding the harmfulness and addictiveness of tobacco usage, Respondents obviously have available for their arsenal of evidence any number of now widely disseminated and widely discussed documents and other materials. *See* Pls.' 4th Am. Compl. at ¶¶ 51–231; Appendix to Opp'n to Pet. § 7, at 1–85. *See also, e.g., Insolia,* 186 F.R.D. at 539–541 (relating the wealth of evidence against tobacco manufacturers and indus-

try trade groups with respect to the potential harmful effects of tobacco usage and the addictive qualities of nicotine).

▉ Yet, despite the Circuit Court's confidence that such allegations suffice for purposes of the class action commonality requirement, and despite Respondents' conclusory argument before this Court (simply reciting the Circuit Court's listing of common issues, as outlined above in the first paragraph of this section), we agree with Petitioners, and the *Insolia* court, that an issue of law or fact should be deemed "common" only to the extent its resolution will advance the litigation of the entire case. *See id.* at 542. Putting aside any skepticism that resolution of the allegedly common issues would advance the litigation of the case at hand, *see Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 96 (W.D.Mo.1997) (explaining that individual issues in tobacco litigation are so inextricably entwined with purportedly common issues that "certifying a class in order to obtain a global resolution of these [common] issues will not advance the resolution of this case"),[22] we shall not on this basis reverse the Circuit Court's judgment that a common nucleus of operative facts exists and that the com-

---

**22.** Of particular note is Petitioners' persuasive argument that

> an examination of defendants' conduct in connection with plaintiffs' fraud claim achieves nothing because an individual trial is still necessary to show whether each class member heard and relied upon an allegedly fraudulent statement. The [Circuit C]ourt's ultimate rationale for class certification—that it would be "senseless to relitigate these common [questions]," ([Cir. Ct. Mem. Op.] at 36)—is inapplicable to this case because the common issues *will* have to be relitigated in each of the many thousands of jury trials for individual class members that follow the common issues trial.

(Petition at 21–22). In addition, Petitioners note that a renowned academic authority directly relied upon by the Circuit Court in making its decision to grant class certification in the instant case,

> Professor Charles Al[an] Wright, a member of the Advisory Committee on the 1966 Amendment of Fed R. Civ. P. 23, opined that certification of what purports to be a class action on behalf of everyone who "has ever been 'addicted' to nicotine" would be a "Frankenstein's monster."

*Id.* at 22 n. 19 (citing *Castano v. American Tobacco Co.*, 84 F.3d 734, 745 n. 19 (5th Cir.1996) (in turn quoting Letter from Professor Wright to N. Reid Neureiter, Williams & Connolly, Washington, D.C. (Dec. 22,1994))).

monality requirement has been satisfied. Underlying our rationale for this restraint is our mindfulness that the less demanding prerequisite of commonality in Rule 2–231(a) is necessarily subsumed in the more exacting requirement of predominance of common issues over individual questions, found in Rule 2–231(b)(3). *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 609, 117 S.Ct. 2231, 2243, 138 L.Ed.2d 689 (1997), (stating that Federal "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions").

### D. Typicality

 The typicality requirement seeks to make certain that "the representative part[ies] . . . be 'squarely aligned in interest' with the class members." 1 NEWBERG, *supra*, § 3.01, at 3–4 to 3–5 (quoting Benjamin Kaplan, *Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I)*, 81 HARV. L.REV. 356, 387 n. 120 (1967)). It is also "intended to ensure that class representatives will represent the best interests of class members who take a less active part in managing the litigation." S. BAICKER-MCKEE, W. JANSSEN, & J. CORR, FEDERAL CIVIL RULES HANDBOOK at 402 (Millennium edition 2000). Professor Newberg characterizes the typicality requirement as follows:

> [A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory. When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims.

1 NEWBERG, *supra*, § 3.13, at 3–76 to 3–77 (citations omitted).

 This requirement demands a common-sense inquiry into whether the incentives of the plaintiffs are aligned with those of the class, and is meant to ensure that representative

parties will adequately represent the class. *See Baby Neal v. Casey,* 43 F.3d 48, 55 (3rd Cir.1994); 7A WRIGHT, MILLER, & KANE, *supra,* § 1764, at 232–233. Representative claims need not be identical to those of the rest of the class; instead, there must be similar legal and remedial theories underlying the representative claims and the claims of the class. *See Jenkins v. Raymark Industries,* 782 F.2d 468, 472 (5th Cir.1986); *see also Baby Neal,* 43 F.3d at 58 (stating that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories").

Petitioners argue that where, as here, the crucial elements of each cause of action will require widely varying individual proof, it is impossible for a plaintiff to be "typical" of the class. Respondents counter that the representative claims were typical because "[e]ach class member has suffered from injuries, medical conditions, and diseases caused by their addiction to or dependence upon nicotine contained in the cigarettes and smokeless tobacco products manufactured, promoted, distributed, and sold by the defendants." (Plaintiffs' Motion for Class Certification at 38–39).

In order to make a determination regarding typicality, we will discuss each of the class plaintiffs.

### Mildred C. Richardson

Mrs. Richardson began smoking when she was around fifteen years old. She started smoking on a regular basis when she was eighteen, "going on nineteen." She started smoking because she "was trying to be grown up" and "keep up with the other crowd because they smoked." She started smoking Camels and later smoked Salem 100's. She suffers from Chronic Obstructive Pulmonary Disease [hereinafter COPD] and has been hospitalized and undergone by-pass surgery. She stopped smoking after having double bypass surgery, then started smoking again.

*Mildred C. Richardson, as personal representative*
*of James B. Richardson*

Mr. Richardson smoked Camel cigarettes and Salem 100's. Mr. Richardson had a stroke and stopped smoking for a while, but then started smoking again. Mr. Richardson was told by a doctor to cut back on his smoking because it was not good for him; he did not stop smoking. He suffered from heart disease and COPD. Mr. Richardson underwent several surgeries prior to his death from a massive heart attack.

*Karol Potter*

Ms. Potter started smoking cigarettes at the age of thirteen. She smoked her first cigarette because "the other kids were smoking" and "it was a cool thing to do." She smoked about a pack of cigarettes a day when she was sixteen in 1964, and by 1975 or 1980 was smoking two packs a day. She first smoked Parliaments for "maybe a week," then smoked Kents for "maybe a week," then smoked Pall Malls and Winstons, each for a long time. She also smoked Lucky Strikes because her husband smoked them, after which she and her husband switched to Viceroys, which she smoked for four or five years. She then started smoking Marlboros, which she currently smokes, averaging two packs a day. She also smoked Raleigh Lites for a period of two or three weeks. She was told by a doctor around 1987 not to smoke because it was aggravating her ulcer, and also told not to smoke by a doctor in 1992. She was diagnosed with COPD and told that her lungs were half gone from smoking. She continues to suffer from COPD and is presently smoking.

*Lonza B. Cutchin*

Mr. Cutchin started smoking when he was fifteen or sixteen years old and living in North Carolina. He moved to Maryland before he was twenty-five years old. He smoked his first cigarette because "most of the time everybody else was smoking, the teenagers, I thought it was a sport." He rolled his own cigarettes at that time, and later smoked Camels and Chesterfields. When he moved to Maryland, he was smoking

Camels and possibly Chesterfields. He quit when he was diagnosed with cancer around 1994. He tried to quit smoking between 1948 and 1988. He suffers from lung cancer and COPD.

 Each of the plaintiffs' cases is factually distinct. This is not fatal to a finding of typicality, however. *See Broin v. Philip Morris Companies,* 641 So.2d 888, 892 (Fla.Dist.Ct. App.1994) (noting that the presence of factual differences will not defeat typicality). Although we do have concerns with the degree of variance between each of the named plaintiff's claims, we feel that these differences are more properly addressed during our predominance inquiry. Importantly, Petitioners do not allege that class representatives would be antagonistic to class members in any way. At this stage in the litigation, Respondents have sufficiently alleged that "the same unlawful conduct was directed at or affected both the named plaintiff[s] and the class[es] sought to be represented," 1 NEWBERG, *supra,* § 3.13, at 3–77. The Circuit Court's ruling that the typicality requirement was satisfied was not an abuse of discretion.

### E. Adequacy of Representation

 The adequacy of representation prerequisite actually addresses two related concerns, ensuring that both the class representatives as well as class counsel are adequate to represent the interests of all class members. This last of the initial preconditions to class certification thus requires first " that the named plaintiff have no conflicts of interest with class members and that he or she prosecute the action vigorously on behalf of the class." 1 NEWBERG, *supra,* § 3.01, at 3–5. As stated by the United States Supreme Court in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997):

> The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. "[A] class representative must be

part of the class and 'possess the same interest and suffer the same injury' as the class members."

*Id.* at 625–26, 117 S.Ct. at 2250–51 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 1896, 52 L.Ed.2d 453 (1977) (in turn quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974))) (other citation omitted) (alteration in *Amchem* ). *See also* 7A WRIGHT, MILLER, & KANE, *supra,* § 1766, at 302–303 (stating that "the general standard is that the representatives must be of such character as to assure the vigorous prosecution or defense of the action so that the members' rights are certain to be protected" (citations omitted)).

 In imposing the requirement of adequacy of representation, the class action rule seeks secondly to verify that counsel is adequate to represent the class. *See Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986) (en banc) (stating that adequacy of representation includes adequacy of attorneys representing class); 7A WRIGHT, MILLER, & KANE, *supra,* § 1769.1, at 375 (observing that under adequacy requirement court will consider not only character and quality of named representative party but also quality and experience of attorneys for class). Factors in this analysis include the vigor of counsel, experience, and diligence. *See Central Wesleyan College v. W.R. Grace & Co.,* 143 F.R.D. 628, 637 (D.S.C.1992), *aff'd,* 6 F.3d 177 (4th Cir.1993). *See also In Re Northern Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d 847, 855 (9th Cir.1982) ("Adequacy of representation depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive."); *Baby Neal v. Casey,* 43 F.3d 48, 55 (3rd Cir.1994) (explaining that adequacy of representation assures "that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class"). This precondition also necessitates that a court focus on conflict of interest concerns, which represent "[b]y far the greatest difficulty for the courts in assessing

whether attorneys are adequate representatives" 7A WRIGHT, MILLER, & KANE, *supra*, § 1769.1, at 383 (citations omitted).

Before this Court, Petitioners do not attack the adequacy of the class representatives. Instead, they claim that class counsel have a conflict of interest and that the Circuit Court erred in finding that class counsel's concurrent representation of the classes in this case and the State of Maryland in a separate lawsuit against Petitioners is not adverse to either party. Because some class members' and the State's interests allegedly collide on the issue of medicaid expense reimbursement, according to Petitioners, class counsel are ethically barred from proceeding any further in the instant litigation and therefore cannot possibly provide adequate representation. We note that the State of Maryland has at this point already entered into a finalized settlement agreement with the tobacco companies, thus rendering Petitioners' objection on this point moot. *See* Agreed Dismissal Order, *State v. Philip Morris Inc.*, No. 96122201/CL211487 (Baltimore City Cir. Ct. Dec. 1, 1998) (acknowledging existence of "Master Settlement Agreement," noting court's entry of "Consent Decree and Final Judgment," and ordering "all of the [State]'s claims against all defendants ... dismissed with prejudice"). In light of this development, in light of the fact that Petitioners have made no other challenge before this Court as to the adequacy of the class representatives or their attorneys,[23] and in light of the reputation and experience of

---

**23.** Although Petitioners have not pressed before us any inadequacy on the part of the named class representatives in representing the classes as a whole, we think the underlying rationale of the adequacy requirement found in Rule 2–231(a)(4) compels a court to conduct a review, even an independent one if necessary, of the class representatives' adequacy. In order to protect the interests of absent class member plaintiffs, it cannot fairly be left to the class defendants to be sufficiently vigilant in contesting the adequacy of the named representatives. We note that the Circuit Court fully addressed the adequacy requirement in the present case, and can find no obvious reason to question the trial judge's declaration that "the Court is satisfied that no named plaintiffs' claim will be antagonistic to any class member's claim; indeed, this Court accepts that the claims will be vigorously prosecuted on behalf of their class," (Cir. Ct. Mem. Op. at 25).

Respondents' counsel,[24] we believe that the Circuit Court did not abuse its discretion in determining that counsel would adequately represent the classes.

## F. Predominance

We must next determine whether questions of law or fact common to the members of the classes predominate over any questions affecting only individual members. "It is only where ... predominance exists that economies can be achieved by means of the class-action device." Federal Rule 23 Committee Note, *supra*, 39 F.R.D. at 103. This requirement is critical to "the notion that the adjudication of common issues will help achieve judicial economy." *Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996). *See also* 7A Wright, Miller, & Kane, *supra*, § 1777, at 518–19 (stating that "the predominance test really involves an attempt to achieve a balance between the value of allowing individual actions to be instituted so that each person can protect his own interests and the economy that can be achieved by allowing a multiple party dispute to be resolved on a class action basis" (citations omitted)).

The predominance test does not require that common issues be dispositive of the action or determinative of the liability issues. *See* 1 Newberg, *supra*, § 4.25, at 4–82. Instead, courts should inquire into "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997). In order to satisfy the predominance test, "common issues must constitute a significant part of the individual cases." *Jenkins v. Raymark Industries*, 782 F.2d 468, 472 (5th Cir.1986). *See also Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir.1992),

---

**24.** In pronouncing class counsel adequate to prosecute the instant case as a class action, the Circuit Court stated: "Lawyers from the Law Offices of [class counsel] have appeared before this Court on numerous occasions regarding asbestos litigation. In light of counsel's vast experience with complex litigation, this Court is satisfied that counsel's representation will be more than adequate." (Cir. Ct. Mem. Op. at 24.)

*reh'g granted,* 990 F.2d 805 (1993), *dismissed on reh'g,* 53 F.3d 663 (1994); *Harding v. Tambrands, Inc.,* 165 F.R.D. 623, 629 (D.Kan.1996) (noting that the Tenth Circuit "focuses on whether the claims involve a common nucleus of operative facts and whether material variations in the claims exist").

### *Conflict of Laws*

The first potentially "individual" issue we shall address is conflict of laws. Petitioners argue that the Circuit Court erred in determining that because the definition of the two classes in the present case is limited to Maryland residents who have experienced the effects of their injury or dependence in Maryland, only Maryland law will apply to all class members. Contrary to the Circuit Court's determination, Petitioners contend that this litigation will require an individual choice-of-law analysis for every member of the two classes. Respondents retort that the Circuit Court properly determined that there will be no variations in state law at issue, because "it is abundantly clear that *only* Maryland law will apply to the class[es], which by definition involve[ ] only individuals who suffered injury in Maryland." (Opp'n to Pet. at 28.) Before the Circuit Court, Respondents asserted that:

> the logical conclusion of [Petitioners'] argument will be that plaintiffs, even in individual cases, will be prevented from asserting their claims against defendants in any forum, unless they coincidentally reside in the state in which the "magical moment of addiction" suggested by [Petitioners] took place. Identifying the moment and place of addiction is irrelevant for purposes of choice of law so long as all the class members currently reside in the [State of] Maryland and experience the effects of their nicotine addiction [in] Maryland.

(Reply Memorandum in Support of Plaintiffs' Motion for Class Certification at 37).

Maryland adheres to the *lex loci delicti* rule in analyzing choice of law problems with respect to causes of action sounding in torts. *See Hauch v. Connor,* 295 Md. 120,

123–25, 453 A.2d 1207, 1209–10 (1983); *White v. King*, 244 Md. 348, 352, 223 A.2d 763, 765 (1966). *See also Farwell v. Un*, 902 F.2d 282, 286 (4th Cir.1990) (observing that "Maryland, against what may be the general trend of latter times toward 'significant relationships' analysis, appears rather steadfastly to have adhered to *lex loci* as the ordering principle in tort cases"). *Lex loci delicti* dictates that "when an accident occurs in another state substantive rights of the parties, even though they are domiciled in Maryland, are to be determined by the law of the state in which the alleged tort took place." *White*, 244 Md. at 352, 223 A.2d at 765.

The rule is fairly easy to apply when all of the events giving rise to a suit have occurred in one state, as in a typical negligence action arising from an automobile accident. Maryland courts would apply the substantive law of the place of the wrong, *i.e.*, the forum where the accident occurred. The more difficult situation arises when the events giving rise to a suit occur in a number of states. As a general rule, the place of the tort is considered to be the place of injury. As set out in the First Restatement of Conflict of Laws,

> 1. *Except in the case of harm from poison, when a person sustains bodily harm, the place of wrong is the place where the harmful force takes effect upon the body.*

* * * * * *

> 2. *When a person causes another voluntarily to take a deleterious substance which takes effect within the body, the place of wrong is where the deleterious substance takes effect and not where it is administered.*

RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 377, Notes 1 and 2, at 455–56 (1934).[25]

---

**25.** As once explained by the Court of Special Appeals,

> Because Maryland is among the few states that continue to adhere to the traditional conflict of laws principle of *lex loci delicti*, the First Restatement of Conflict of Laws, while of merely historical interest elsewhere, continues to provide guidance for the determination of *lex loci delicti* questions in Maryland.

This Court has acknowledged that "the tort doctrine of *lex loci delicti* ... requires a tort action to be governed by the substantive law of the state where the wrong occurred." *Hauch,* 295 Md. at 123, 453 A.2d at 1209 (quoted in *In re Sabin Oral Polio Vaccine Prods. Liab. Litig.,* 774 F.Supp. 952, 954 (D.Md.1991), *aff'd,* 984 F.2d 124 (4th Cir.1993)). *See also Johnson v. Oroweat Foods Co.,* 785 F.2d 503, 511 (4th Cir. 1986) (explaining that under Maryland conflict of law jurisprudence, "the law of the place of injury applies. The place of injury is the place where the injury was suffered, not where the wrongful act took place." (Citation omitted)); *Trahan v. E.R. Squibb & Sons, Inc.,* 567 F.Supp. 505, 507 (M.D.Tenn. 1983) ("If the tortious act and resulting injury occur in different jurisdictions, the law in Tennessee, as in most jurisdictions, is that the law of the state where injury was *suffered* controls—not the law of the state where the wrongful act took place."); ROBERT A. LEFLAR, AMERICAN CONFLICTS LAW § 133, at 267 (3rd ed. 1977) ("Some acts ... produce impacts across state lines. The orthodox rule, with torts as with crimes, is that when an act operates across a state line its legal character is determined by the law of the place where it first takes harmful effect or produces the result complained of." (Footnotes omitted)).

 The place of injury is also referred to as the place where the last act required to complete the tort occurred. *See* RESTATEMENT (FIRST) OF CONFLICT OF LAWS § 377 (stating that the "place of wrong is the state where the last event necessary to make an actor liable for an alleged tort takes place"); *Farwell,* 902 F.2d at 286 (explaining that, under the doctrine of *lex loci delicti,* "the locus of a tort for choice of law purposes is that where the last act required to complete it occurred"); *Alexander v. General Motors Corp.,* 219 Ga.App. 660, 466 S.E.2d 607, 609 (1995) (noting that, under the doctrine of *lex loci delicti,* "in torts of a transitory nature the place of the wrong is the place where the last event occurred neces-

*Black v. Leatherwood,* 92 Md.App. 27, 41, 606 A.2d 295, 301, *cert. denied,* 327 Md. 626, 612 A.2d 257 (1992).

sary to make an actor liable for the alleged tort"), *rev'd on other grounds*, 267 Ga. 339, 478 S.E.2d 123 (1996); Richard W. Bourne, *Modern Maryland Conflicts: Backing into the Twentieth Century One Hauch at a Time*, 23 U. BALT. L. REV. 71, 77 (1993) (noting that "in tort cases, Maryland applies *lex loci delicti*, which it construes as meaning the law of the place where the last event giving rise to a right to recovery occurred" (footnotes omitted)); HERBERT F. GOODRICH, HANDBOOK OF THE CONFLICT OF LAWS § 93, at 263–64 (3d ed. 1949) ("The tort is complete only when the harm takes place, for this is the last event necessary to make the actor liable for the tort.").

We now turn to the application of Maryland's *lex loci delicti* rule to the litigation at issue. We cannot say, nor could the Circuit Court, that absent individualized inquiry on the part of the trial court, Maryland law would apply to each entire class. The Circuit Court simply misapplied the law in determining in blanket fashion that "only the law of Maryland will apply to all class members," (Cir. Ct. Mem. Op. at 42).[26] Quite the opposite, our conflict of law principles necessitate that the Circuit Court engage in individualized assessments for each class member. *Cf. Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3rd Cir.1996) (recognizing that a federal court, considering a motion for a nationwide class certification, "must apply an individualized choice of law analysis to each plaintiff's claims" (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 823, 105 S.Ct. 2965, 2980, 86 L.Ed.2d 628 (1985))), *aff'd sub nom., Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

---

**26.** In direct response to Petitioners' contention that significant choice of law problems militated against granting Respondents' Motion for Class Certification, the Circuit Court stated more fully:

In this case, [Petitioners] have substantial business contacts in Maryland and [each] class is limited by the class definition which provides that only Maryland residents who have experienced the effects of their injury/dependence in this state, may qualify as class members. In any event, the state where the initial exposure to [Petitioners]' products took place is of little significance in relation to the alleged harm suffered by Maryland residents. Therefore, only the law of Maryland will apply to all class members.

(Cir. Ct. Mem. Op. at 42.)

Unlike in perhaps most single-event disasters, in long term exposure cases such as tobacco usage, events giving rise to a cause of action may occur in many different states. *See Geiger v. American Tobacco Co.*, 181 Misc.2d 875, 696 N.Y.S.2d 345, 349 (N.Y.Sup.Ct.1999) (stating that a "tobacco case does not involve a mass tort arising from a single accident or catastrophic event"). Clearly, a person may be exposed to tobacco in one state, experience manifestations of disease in another state, and be diagnosed with an illness in yet another state. Take, for example, the case of a person who used tobacco products in a particular state, initially suffered the effects of illness in another state, was diagnosed with a tobacco-related disease or diseases in a different state, and subsequently moved to Maryland. That person would fall within the class definition approved by the Circuit Court as a "Maryland resident[ ] as of the date of class notice who [has] suffered, presently suffer[s], or who [has] died of diseases, medical conditions, and injury (while a resident of Maryland) caused by smoking cigarettes or using smokeless tobacco products that contain nicotine," (Circuit Court Class Certification Order at 1). In that scenario, Maryland, however, could not qualify as the "place of wrong," "place of injury," or the place where "the last act giving rise to the cause of action" occurred. The only connection between that person and Maryland would be residency at the time of class notice.

Respondents also claim nicotine dependence, or addiction, as an injury in and of itself. The second class certified by the Circuit Court includes "[a]ll nicotine dependent persons in Maryland who have purchased and used cigarettes and smokeless tobacco products manufactured by the Defendant Tobacco Companies," (Circuit Court Class Certification Order at 2). As indicated earlier, for purposes of the present litigation, a nicotine dependent person is one who either (1) has been medically diagnosed as such, (2) has regularly smoked more than fifteen cigarettes per day for at least three years and has made at least one unsuccessful effort to quit smoking, or (3) has been a regular daily user of smokeless tobacco products for at least three years and has made at least one unsuccessful

effort to quit using smokeless tobacco.[27] Given these criteria, the alleged injury-in-fact, nicotine dependence or addiction, clearly may have occurred in a state other than Maryland. Simply because a person remains addicted in Maryland does not mean that such a person suffers a "new" injury of addiction every day that person resides in Maryland. Such an interpretation, as in the previous hypothetical, would erroneously render "place of injury" equivalent to "place of residency." In *Emig v. American Tobacco Co.*, 184 F.R.D. 379 (D.Kan.1998), the United States District Court for the District of Kansas recognized such difficulties in refusing to certify a class of Kansas smokers:

> In order to avoid choice of law concerns that raised problems in other actions involving certification of mass torts, plaintiffs attempt to limit members of the class to persons whose claims are properly disposed of under Kansas law. . . . Kansas adheres to *lex loci delicti* which provides that the place of the law of the state where the tort occurred applies. A tort occurs where the injury occurs.
>
> Plaintiffs overlook the difficulty involved in determining if class members' injuries "occurred" in Kansas. For instance, plaintiffs' broadest class injury alleged is addiction. To determine if this injury occurred in Kansas, a conclusion would have to be reached as to each member that they [sic] became addicted to cigarettes in Kansas. Only after such consideration is it possible to determine whether each person can be admitted to the class. The process would involve a hearing for every potential plaintiff because defendants would have the right to cross-examine each person about his or her smoking history. This task is unimaginably difficult considering the individual inquiry required to determine addiction.

*Id.* at 393–94 (citations and footnote omitted). *See also Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 96

---

**27.** The verbatim definition of a "nicotine dependent" person, set out by the Circuit Court in its Class Certification Order, is reproduced in the text *supra* accompanying note 3.

(W.D.Mo.1997) (noting that even though plaintiff did not seek certification of nationwide class, class of Missouri citizens allegedly injured by Brown & Williamson cigarettes would "still be governed by a myriad of [states'] laws").[28]

### · *Additional Individual Issues*

Also tipping the scales of the predominance inquiry against Respondents is the legal nature of their common law claims of fraud and deceit and negligent misrepresentation, and their statutory cause of action under various provisions of the Maryland Consumer Protection Act. The unsuitability of such claims for class action treatment arises from the burden placed on Respondents of proving individual reliance upon Petitioners' alleged misrepresentations and material omissions regarding (1) the addictive nature of nicotine; (2) the adverse health effects of tobacco usage; (3) Petitioners' knowledge of and research concerning the addictive nature of nicotine and

---

**28.** These difficulties are compounded by the fact that neither this court nor the Court of Special Appeals has had occasion to discuss the impact of *lex loci delicti* on some of the tort causes of action. *See Banca Cremi v. Brown,* 955 F.Supp. 499, 522 (D.Md.1997) ("It appears that Maryland courts have not yet specifically spoken as to the issue of where the 'wrong' occurs in cases of pecuniary injury resulting from fraud [or] negligent misrepresentation ... when the alleged wrongful act or omission occurred in one jurisdiction and the 'loss' by plaintiff in another jurisdiction."), *aff'd,* 132 F.3d 1017 (4th Cir. 1997).

Further, *lex loci delicti* will apply only to the tort claims (fraud and deceit, negligent misrepresentation, intentional infliction of emotional distress, and negligence). Respondents allege other causes of action that would implicate additional choice-of-law doctrine. *See Frericks v. General Motors Corp.,* 278 Md. 304, 363 A.2d 460 (1976) (applying Maryland law imposing secondary liability for design defect in breach of warranty claim where car was sold in Maryland, although accident occurred in North Carolina); *Volkswagen of America v. Young,* 272 Md. 201, 220, 321 A.2d 737, 747 (1974) (reiterating that the "general rule, to which we adhere, is that 'the law of the place of the sale determines the extent and effect of the warranties which attend the sale' " (quoting *Schultz v. Tecumseh Products,* 310 F.2d 426, 428 (6th Cir.1962))). *See also Smith v. Brown and Williamson Tobacco Corp.,* 174 F.R.D. 90, 96 (W.D.Mo.1997) ("[I]t is possible that different [states'] laws will apply to the different claims asserted by a single claimant: for instance, it may be that one state's laws will apply to a person's breach of warranty claims while another state's laws apply to that individual's strict liability claims.").

the adverse health effects of tobacco usage; (4) Petitioners' manipulation of nicotine levels and the bio-availability of nicotine in tobacco products; and (5) Petitioners' intent to addict consumers to tobacco usage.

Concerning the propriety of prosecuting a civil fraud claim as a class action, the Advisory Committee Note to the 1966 amendments of Federal Rule 23 counsels as follows:

> [A] fraud perpetrated on numerous persons by the use of similar misrepresentations 'may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or *in the kinds or degrees of reliance by the persons to whom they were addressed.*

Federal Rule 23 Committee Note, *supra,* 39 F.R.D. at 103 (emphasis added). In light of these concerns, we conclude that reliance is another issue unique to each putative class member, thus adding extra weight to the predominance of individual over common questions and further rendering the present litigation unfit for class action treatment.

■ Success in Maryland on a civil claim of fraud requires proof of reliance. As this Court has frequently reiterated,

> In order to recover damages in an action for fraud or deceit, a plaintiff must prove (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) *that the plaintiff relied on the misrepresentation and had the right to rely on it,* and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S & R, Inc.,* 334 Md. 398, 415, 639 A.2d 660, 668 (1994) (emphasis added) (citing eleven cases dating back to 1872).[29]

---

**29.** Respondents appear to be pursuing two interrelated yet separate theories of fraud, the first consisting of the allegation that Petitioners intentionally misrepresented the harmful effects born from tobacco usage, the addictive nature of nicotine, and Petitioners' manipulation of nicotine levels in their tobacco products. The second charge of "fraud" pleaded by Respondents involves not any misrepresentation by Petitioners per se but rather a type of fraudulent behavior:

> Defendants knew or acted with reckless indifference to the fact that nicotine was addictive, defendants manipulated the amount of nicotine levels and/or the bio-availability of nicotine in the tobacco products, and defendants intended to addict cigarette smokers but refrained from disclosing the facts to cigarette smokers, for the purpose of inducing them to purchase tobacco products, thus causing Plaintiffs to incur injury and damages.

(Pls.' 4th Am. Compl. at ¶ 243). In apparent reference to this second type of "fraud," Respondents argue to this Court that the reliance element normally required of a civil claim of fraud is essentially excused:

> [I]n many cases, plaintiffs must prove reliance and/or specific causation on an individual basis. This case, however, includes allegations of a far more insidious nature: that defendants' acts of manipulating and/or controlling nicotine in their cigarettes through the secret use of additives such as ammonia and acetaldehyde are a substantial— though hidden factor—in causing nicotine addicted customers to continue to purchase their cigarettes. Therefore, it is . . . [un]necessary to prove that each individual plaintiff purchased cigarettes in "reliance on" or "because of" their nicotine addiction. . . .
>
> * * * * * *
>
> In this case, Plaintiffs allege that the defendants intentionally engineered their products to make them deliver more nicotine "impact" without increasing the amounts of nicotine in their products. This is a fraudulent/deceptive act common to all defendants, which physically affected all users. Under these facts, reliance/causation need not be proven on an individual basis: rather, it can be established for all smokers based on scientific testimony on the effects on the human body of nicotine enhanced by additives such as ammonia and acetaldehyde.

(Opp'n to Pet. at 25–26.)

Respondents, understandably, have cited no Maryland authority for their proposition that proof of reliance is excused. For, what Respondents ignore is that central not only to the reliance element in a civil claim of fraud in this State but to the very tort itself is that there have been some sort of misrepresentation by the defendant to the plaintiff, *i.e.* some communication or material omission which the plaintiff relied upon and which caused him or her injury. It is incorrect, therefore, to refer to the reliance Respondents concede is ordinarily required of a

■ The common law tort of negligent misrepresentation likewise incorporates reliance as an element of proof. *See Sheets v. Brethren Mutual,* 342 Md. 634, 656–57, 679 A.2d 540, 551 (1996) (repeating that included within the prima facie elements of the tort of negligent misrepresentation in Maryland are that "the defendant has knowledge that the plaintiff will probably rely on the [defendant's negligently asserted false] statement, which, if erroneous, will cause loss or injury" and that "the plaintiff, justifiably, takes action in reliance on the statement" (quoting *Gross v. Sussex,* 332 Md. 247, 259, 630 A.2d 1156, 1162 (1993))). Reliance by consumers would also seem to be a necessary precondition to awarding restitution or damages pursuant to the statutory consumer protection provisions pleaded by Respondents. *See Luskin's v. Consumer Protection,* 353 Md. 335, 386, 726 A.2d 702, 727 (1999); *Consumer Protection v. Consumer Pub.,* 304 Md. 731, 781, 501 A.2d 48, 74 (1985) (holding in case of agency-initiated action that blanket order of automatic restitution to all consumers was improper because restitution to particular purchasers was appropriate only after verification of actual reliance by those purchasers on company's misleading or deceptive advertisements); *Consumer Protection v. Outdoor World,* 91 Md.App. 275, 291, 603 A.2d 1376, 1383 (1992) (stating that "actual restitution may not be ordered in the absence of some evi-

---

fraud claim as "'reliance on' ... nicotine addiction." *Id.* at 25. What Respondents have pleaded as an alternative basis for their claim of fraud, the purposeful and undisclosed manipulation of nicotine levels resulting in (1) their addiction, (2) their concomitant uncontrolled purchase and use of harmful tobacco products, or (3) their suffering from disease or injury, may perhaps constitute instead an intentional personal tort such as battery, a cause of action which truly does contain no required proof of any reliance whatsoever on the part of the plaintiff(s). *See Saba v. Darling,* 320 Md. 45, 49, 575 A.2d 1240, 1242 (1990) ("A battery has been defined as a harmful or offensive contact with a person resulting from an act intended to cause the person such contact." (Citing Restatement (Second) of Torts § 13 (1965))). Even were such a claim cognizable and properly pleaded, it can neither change nor cure the fact that several causes of action actually asserted by Respondents, including their claim of fraud and deceit, require not only proof of reliance but proof of such on an individual basis.

dence that the individual purchaser was deceived by and relied upon the offending communication").

One need only read the depositions of the named class representatives to recognize that reliance will vary from plaintiff to plaintiff.[30] Prospective class members may have heard or read some, all or none of the misrepresentations allegedly made by Petitioners. Moreover, in making the decision to purchase and use Petitioners' tobacco products, each member may have relied heavily, slightly or not at all on the various, arguably deceitful sales pitches, multimedia denials and assertions, and otherwise public claims of Petitioners with respect to their tobacco products. Such individual discrepancies obviously cannot be glossed over at trial on a classwide basis but must be allowed to be delved into by Petitioners, class member by class member.[31]

---

**30.** *See* synopses of class representatives' depositions *supra* pp. 738–40.

**31.** The case law and academic authority cited by Respondents for the proposition that the existence of the admittedly individual issue of reliance should not preclude class certification, *see* Opp'n to Pet. at 23–24, while failing on their own to persuade us, are, moreover, factually distinguishable and inapposite from the circumstances at hand. *Green v. Wolf Corp.*, 406 F.2d 291 (2d Cir.1968), *cert. denied*, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969), involved 2200 stockholders in a federal securities fraud class action lawsuit while *In re Crazy Eddie Securities Litig.*, 802 F.Supp. 804 (E.D.N.Y.1992), likewise concerned a securities fraud class action, for "at least thousands" of stock purchasers, *see In re Crazy Eddie Securities Litig.*, 135 F.R.D. 39, 40 (E.D.N.Y. 1991). These cases simply didn't involve the exorbitant size of the possible class membership in this case.

*In re College Bound Consol. Litig.*, 93 Civ. 2348(MBM), 1994 WL 236163, 1994 U.S. Dist. LEXIS 7074 (S.D.N.Y. May 27, 1994), was another securities fraud class action lawsuit, yet of truly grand proportions as the putative plaintiffs numbered perhaps millions. *See id.* at *2, 1994 U.S. Dist. LEXIS 7074 at *7. The case is distinguishable, nevertheless, because the court explicitly refrained from determining whether the issue of reliance had to be proven individually or could be tried *en masse* or by subclasses. *See id.* at *4, 1994 U.S. Dist. LEXIS 7074 at *13–14. In the instant lawsuit, as we have explained, reliance is clearly an individual issue given the undeniable diversity of the potential class pool with respect to geographical distribution during various periods, time period of tobacco usage, age, receipt of or attention to none or all of the alleged misrepresentations by Petitioners, among other factors. The case of *In re General Motors Corp. Pick–Up*

Even more uncommon issues abound in this case. For instance, whether an individual is "dependent" on or "addicted" to nicotine, aside from the concomitant choice of law problems discussed earlier, is an issue that would need to be evaluated on an individual basis. *See Barnes v. American Tobacco Co.*, 176 F.R.D. 479, 500 (E.D.Pa.1997), *aff'd*, 161 F.3d 127 (3rd Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); *see also Emig v. American Tobacco Co.*, 184 F.R.D. 379, 389 (D.Kan.1998). Furthermore, to establish a cause of action for intentional infliction of emotional distress, Respondents must establish that emotional distress is "severe," thus requiring individual assessments. *See Caldor v. Bowden*, 330 Md. 632, 625 A.2d 959 (1993). Affirmative defenses will also come into play, with Petitioners alleging assumption of the risk, contributory negligence, and, where the "place of wrong" for a particular plaintiff occurred in one of certain other states, comparative negligence. On the issue of causation, Respondents argue that "injury in fact" causation focuses on the effects of Petitioners' conduct on each class as a whole and may be proved on a classwide basis. We have serious doubts, given each of the legal claims of Respondents,

---

*Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3rd Cir.1995), also encompassed an inordinate number of plaintiffs, some six million truck owners nationwide, in a products liability class action settlement approved by the trial court that the appellate court nevertheless ultimately rejected. We do not place much credence in the opinion's declaration that "individualized issues such as damages or reliance ... do not ordinarily preclude the use of the class action device," *id.* at 817. The context of that statement embodied the appellate court's outline of creative approaches to class certification that might be considered on remand with respect to the difficult yet solvable problem of the individualized nature of damages in that case. The cited principle, therefore, lacks probative value as to the distinct problem of reliance faced in this case.

Finally, although a leading treatise on civil practice in another state asserts that "[i]f there is a reasonable expectation that most members of the class relied on the [defendants'] representations, then class-wide reliance may be presumed for purposes of class certification," 3 J. WEINSTEIN, H. KORN & A. MILLER, NEW YORK CIVIL PRACTICE ¶ 901.12, at 9–56 (1999), such an expectation cannot reasonably be assigned to the putative class members in the present case on account of the dissimilarities highlighted above.

that the issue of causation will not need to be decided at some point as to each individual class member. *See Insolia v. Philip Morris Inc.*, 186 F.R.D. 535, 546 (W.D.Wis.1998) ("Causation remains one of the more formidable issues not subject to general proof."); *Barnes,* 161 F.3d at 135 ("The resolution of this 'general causation question' would accomplish nothing for any of the individual plaintiffs."); *Smith v. Brown & Williamson Tobacco Corp.,* 174 F.R.D. 90, 96 (W.D.Mo.1997) (" '[A] finding of "general causation" would do little to advance this litigation.' Liability will not turn on whether cigarettes are generally capable of causing disease: liability will depend upon whether cigarettes caused a particular plaintiff's disease." (Quoting *Harding v. Tambrands Inc.*, 165 F.R.D. 623, 630 (D.Kan.1996)) (other citations omitted)); *In Re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 165 (2d Cir.1987) ("The relevant question ... is not whether Agent Orange has the capacity to cause harm, the generic causation issue, but whether it *did* cause harm and to whom. That determination is highly individualistic. . . .").[32]

---

**32.** Petitioners argue that another individual issue is whether the statute of limitations has run on particular class members' claims. Respondents reply that

> this issue will be resolved in whole, or in significant part, by the presentation of evidence regarding [Petitioners'] fraudulent concealment of their knowledge regarding the addictiveness of nicotine. If [Respondents] prevail on this common claim, [Petitioners] may be equitably estopped from relying on the statute of limitations in all cases and individual issues relating to this defense will not arise at all.
>
> * * * * * *
>
> Furthermore, the class trial may also be able to determine when—if ever—an ordinary Maryland consumer should have been on notice of the existence of the claims alleged herein—i.e. that [Petitioners] know nicotine is addictive and nevertheless control and manipulate the nicotine in their cigarettes with the known effect of causing and/or maintaining addiction, and that [Petitioners] use chemical additives in their cigarettes in order to enhance nicotine delivery—thus establishing a common time for the running of applicable statutes of limitation.

(Opp'n to Pet. at 27–28.)

On this issue, we agree with the United States District Court for the District of Puerto Rico that our decision to command the Circuit Court to decertify the classes "render[s] it unnecessary to reach the conten-

*Predominance case law in other jurisdictions*

The predominance inquiry has proven to be the downfall of many mass tort class actions. Our concerns that individual issues would predominate over common issues in this litigation are mirrored in the United States Supreme Court's most recent pronouncement on class actions, in *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). *Amchem* involved a national asbestos class action lawsuit in which the Third Circuit had decertified the class because common issues did not predominate over individual issues. The Supreme Court affirmed, agreeing that "an over-arching dispute about the health consequences," *id.* at 624, 117 S.Ct. at 2250, of exposure to a potentially harmful product does not suffice for purposes of the predominance requirement of Federal Rule 23(b)(3) in the face of significant issues peculiar to individual class members:

> "Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling asbestosis, or from mesothelioma. . . . Each has a different history of cigarette smoking, a factor that complicates the causation injury."

*Id.,* 117 S.Ct. at 2250 (quoting *Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 626–27 (3rd Cir.1996)) (ellipsis in Supreme Court's *Amchem* opinion). *See also* Note, *Decertification of Statewide Tobacco Class Actions,* 74 N.Y.U. L.Rev. 1336, 1344–45 (1999). The Supreme Court went on to note that

---

tious statute of limitations issue." *Barreras Ruiz v. American Tobacco Co.,* 180 F.R.D. 194, 199 (D.P.R.1998). For cases analyzing the effect of statute of limitations issues on the predominance requirement in class action lawsuits, see *Barnes v. American Tobacco Co.,* 161 F.3d 127, 149 (3d Cir.1998); *In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1304 (7th Cir.1995); *Emig v. American Tobacco Co.,* 184 F.R.D. 379, 391 (D.Kan.1998); *Dhamer v. Bristol–Myers Squibb Co.,* 183 F.R.D. 520, 532–33 (N.D.Ill.1998); *Hamilton v. Ohio Sav. Bank,* 82 Ohio St.3d 67, 694 N.E.2d 442, 457 (1998); *E & V Slack, Inc. v. Shell Oil Co.,* 969 S.W.2d 565, 570 (Tex.Ct.App.1998).

differences in state law compound these disparities, and then observed:

> No settlement class called to our attention is as sprawling as this one. Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws. Even mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement. The Advisory Committee for the 1966 revision of Rule 23, it is true, noted that "mass accident" cases are likely to present "significant questions, not only of damages but of liability and defenses of liability, ... affecting the individuals in different ways." And the Committee advised that such cases are "ordinarily not appropriate" for class treatment. But the text of the Rule does not categorically exclude mass tort cases from class certification, and District Courts, since the late 1970's, have been certifying such cases in increasing number. The Committee's warning, however, continues to call for caution when individual stakes are high and disparities among class members great. As the Third Circuit's opinion makes plain, the certification in this case does not follow the counsel of caution. That certification cannot be upheld, for it rests on a conception of Rule 23(b)(3)'s predominance requirement irreconcilable with the Rule's design.

*Amchem,* 521 U.S. at 624–25, 117 S.Ct. at 2250 (citations omitted) (ellipsis in *Amchem*).

The Fifth Circuit, in perhaps the seminal case involving mass tort tobacco litigation, heralded a similar proclamation directly relevant to this same issue in the present case:

> The class members were exposed to nicotine through different products, for different amounts of time, and over different time periods. Each class member's knowledge about the effects of smoking differs, and each plaintiff began smoking for different reasons. Each of these factual differences impacts the application of legal rules such as causation, reliance, comparative fault, and other affirmative defenses.

*Castano v. American Tobacco Co.*, 84 F.3d 734, 742–43 n. 15 (5th Cir.1996). *See also Cimino v. Raymark Industries, Inc.*, 151 F.3d 297, 319 (5th Cir.1998) (noting that "under Texas law causation must be determined as to individuals, not groups") (internal quotation marks and citation omitted). *Cf. Arch v. American Tobacco Co.*, 175 F.R.D. 469, 488–89 (E.D.Pa.1997) (concluding that question of causation of actual rather than merely potential addiction "is highly individualized and does not lend itself to Rule 23(b)(2) certification").

While both *Castano* and *Amchem* involved nationwide class actions, these same problems of predominant individual issues have arisen in statewide class actions. For example, the District Court for the Western District of Missouri refused to certify a class of Missouri smokers defined as "[a]ll persons in the State of Missouri who have suffered personal injury as a result of smoking cigarettes designed, manufactured or sold by Brown & Williamson Tobacco Company...." *Smith v. Brown & Williamson*, 174 F.R.D. 90, 92 (W.D.Mo.1997). That court stated that

> a separate inquiry will be required to determine which state's substantive laws will govern. In the case of a life-long Missouri resident, it seems clear that Missouri law would apply. In the case of a resident of another state who stopped smoking before moving to Missouri, it seems clear that Missouri law would not apply. In the case of a person (like Plaintiff) who began smoking in another state and then moved to Missouri, the choice of law inquiry will vary with the circumstances. It is inconceivable that [Missouri] law will apply to all members of the class; in fact, it is possible that different [states'] laws will apply to the different claims asserted by a single claimant: for instance, it may be that one state's laws will apply to a person's breach of warranty claims while another state's laws apply to that individual's strict liability claims.
>
> Ultimately, it is clear that Missouri law will not apply to all of the class members' claims. Thus, although Plaintiff does not seek certification of a nationwide class, the claims presented by the proposed class will still be governed by a

myriad of [states'] laws. The wide variety of state laws that must be applied diminishes the common issues and prevents them from predominating.

*Id.* at 95–96. *See Reed v. Philip Morris Inc.,* Civil No. 96–5070, 1997 WL 538921 (D.C.Super.Ct. Aug. 18, 1997) (*Reed I* ) (refusing to certify a similar class of District of Columbia tobacco users); *see also Barreras Ruiz v. American Tobacco Co.,* 180 F.R.D. 194, 197 (D.P.R.1998) (noting that "[a]lthough the proposed class would number in the hundreds of thousands rather than *Castano*'s fifty million cigarette smokers, such a class nonetheless would present unprecedented challenges to the fundamental notion of commonality underlying a class action"); *Barnes v. American Tobacco Co.,* 176 F.R.D. 479, 498 (E.D.Pa.1997) (deciding to decertify class of Pennsylvania smokers because "it is obvious that this action implicates far too many individual issues to proceed on a class-wide basis"), *aff'd,* 161 F.3d 127 (3rd Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999); *Reed v. Philip Morris Inc.,* Civil No. 96–5070, slip op. (D.C.Super.Ct. July 23, 1999) (*Reed II* ) (refusing to certify reduced class of District of Columbia tobacco users).

■■■ Our analysis of the extent of the individual issues involved in this litigation leads us to conclude that individual issues overwhelmingly predominate over common issues. *See Smith,* 174 F.R.D. at 94 ("Resolution of the common issues in this case will not promote judicial economy; in fact, in light of the individual issues a class action in this case will create judicial *dis*economy."). We agree with the United States District Court for the Eastern District of Pennsylvania, which, in rejecting class certification for Pennsylvania smokers, held that "the individual issues raised not only predominate over the common issues but overwhelm the common issues" *Arch,* 175 F.R.D. at 486.

The seeming collective lynchpin of the Circuit Court's finding of predominance of common issues in the instant litigation is "that the common questions regarding [Petitioners'] conduct and knowledge ... are at the core of all of [Respondents']

liability claims," (Cir. Ct. Mem. Op. at 37), that the jury's assessment of "any one of these issues may potentially be dispositive of the entire [lawsuit]," *id.* at 32, and that "if [Petitioners] prevail in the adjudication of the significant common questions, the case is concluded," *id.* at 33 (footnote omitted). The crucial flaw with the Circuit Court's narrowing of the predominance analysis in this fashion was aptly explicated in a recent Michigan decision, *Taylor v. American Tobacco Co.,* No. 97 715975 NP, slip op. (Wayne County, Mich. Cir. Ct. Jan. 10, 2000). There the trial court denied class certification of a tobacco lawsuit in which plaintiffs relied in part on the Circuit Court's opinion below, which the court discredited as follows:

> [T]he rationale of courts that have certified tobacco personal injury suits as class actions, such as *Richardson* . . ., relies heavily on the premise that an adverse ruling on certain common foundational issues would result in dismissal of the entire case. But missing from their analysis is any detailed explanation whether common questions would predominate if the common questions are resolved in plaintiffs' favor. While acknowledging that resolution of the common questions in plaintiffs' favor will not dispose of the case, it seems that they give little attention to the predominance question as it would be affected after the resolution of one or more common questions in favor of the plaintiffs.

*Id.* at 10–11.

In a District of Columbia tobacco lawsuit strikingly similar to the present one, *see Reed I,* after the trial court initially denied their motion for class certification, the representative plaintiffs purposefully excised certain, problematic causes of action from their complaint—claims that remain in the case now before this Court—in an effort to reduce the number of individualized issues, satisfy the predominance requirement and therefore, arguably, render their litigation suitable for class action treatment. *See Reed II,* slip op. at 4. The trial court deemed the maneuver futile, however, and ruled that the absence of claims of fraud and deceit, negligent misrepresen-

tation and breach of express warranty was insufficient to tip the scales in the favor of class action certification:

> The Court concurs that a large portion of [Plaintiffs'] claim is based upon the Defendants' conduct in making and marketing cigarettes. Plaintiffs also are accurate that many common issues exist. Nonetheless, even with the changes to Plaintiffs' Complaint, too many individualized issues exist, such as injury-in-fact, addiction, causation and reliance, and individual defenses, which preclude this Court from finding that common issues predominate over individual issues.

*Reed II,* slip op. at 30–31. It is equally clear the Circuit Court should have come to a like conclusion in the present case: class certification is simply not appropriate in the face of so many individualized, significant issues despite the purported "qualitative" force of the less numerous common questions.[33]

### G. Superiority

In addition to predominance, the Circuit Court must find that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. As the Superior Court of the District of Columbia ruled within the past year, "[B]efore a class maybe certified, it must be shown that a class action is the superior method for resolving the conflict; in other words, it must be the most efficient means of adjudicating the matter." *Reed v. Philip Morris Inc.,* Civil No. 96–5070, slip op. at 34 (D.C.Super.Ct. July 23, 1999) (*Reed II*). *See also Valentino v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996) ("Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation."). In accordance with Rule 2–231(b)(3), pertinent to the court's findings are (1) the

---

**33.** The Circuit Court found "that while the individual issues may quantitatively out number the common issues, qualitatively, the common issues outweigh the individual issues in terms of their scope and complexity." (Cir. Ct. Mem. Op. at 32.)

interests of members of each class in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of each class, (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and (4) the difficulties likely to be encountered in the management of a class action. This list is non-exhaustive. *See* Federal Rule 23 Committee Note, *supra,* 39 F.R.D. at 104; 1 NEWBERG, *supra,* § 4.28, at 4–113.

■ As to the first factor, the greater the individuals' stakes in the litigation, the greater their interest in controlling their own actions in individual litigation. *See Emig v. American Tobacco Co.,* 184 F.R.D. 379, 393 (D.Kan.1998). In this action, the representative plaintiffs claim in excess of $500,000 in compensatory damages, as well as $1,000,000 in punitive damages, for each class member. *See Johnson v. Chrysler Credit Corp.,* 26 Md.App. 122, 129, 337 A.2d 210, 214 (1975) ("Although in some circumstances the class action may be an important public interest device, in others it contravenes the more traditional notions of an individual's jurisprudential rights."). We find it relevant and compelling that individual plaintiffs historically have often been unable to finance a claim against the tobacco companies. We note, however, that individuals may have enormous stakes in individual tobacco litigation. *See, e.g.,* Charles Haddad, *Why Big Tobacco Can't Be Killed,* BUSINESS WEEK, Apr. 24, 2000, *available in* 2000 WL 7825958 (reporting on Florida jury's finding tobacco industry liable to three plaintiffs and their survivors for compensatory damages of almost seven million dollars, and noting trial victories by three individual plaintiff smokers in separate California and Oregon cases during previous eighteen months resulting in jury awards totaling more than seventy million dollars). We are also cognizant that several courts have discredited prospective tobacco class action plaintiffs' assertions that individual suits are infeasible. *See, e.g., Castano v. American Tobacco Co.,* 84 F.3d 734, 747 n. 25 (5th Cir.1996) (calling plaintiffs' claims of resource disparity "overstated"); *Reed v. Philip Morris Inc.,* Civil No. 96–5070, 1997 WL

538921 at \*12 (D.C.Super.Ct. Aug. 18, 1997) (*Reed I* ) (commenting that "there does not appear to be any shortage of attorneys willing to undertake tobacco litigation" and attributing lack of individual tobacco lawsuits to possibility that "individuals are not filing claims because they feel they have no compensable injury, that they have no desire to quit smoking, or that they feel personally responsible for any condition from which they may suffer because they made a choice to smoke").

The second factor focuses upon the extent and nature of litigation concerning the controversy that has already been commenced. This evaluation "is aimed at determining whether there is so much pre-existing litigation that a class would be unproductive.... " *Central Wesleyan College v. W.R. Grace & Co.*, 143 F.R.D. 628, 640 (D.S.C.1992), *aff'd*, 6 F.3d 177 (4th Cir.1993). Similarly, reviewing whether other litigation of the same type is currently pending "is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits." 7A WRIGHT, MILLER, & KANE, *supra*, § 1780, at 568–69. To our knowledge, and according to the parties, there are very few, if any, individual tobacco cases currently pending in Maryland courts. Hence, there hardly exists any "risk of inconsistent adjudication or multiplicity of actions at this point." *Emig*, 184 F.R.D. at 393. Nor does there appear to be any "impending explosion of injury-as-addiction [or other tobacco-related] claims that would justify certification of the action." *Id.*

Third, a court considering class certification must appraise the desirability of permitting the litigation concerning the present controversy to be concentrated in one forum. Professors Wright, Miller and Kane explain this factor in the following way:

This factor embodies basically two considerations. First, a court must evaluate whether allowing a Rule 23(b)(3) action to proceed will prevent the duplication of effort and the possibility of inconsistent results....

The other consideration ... is whether the forum chosen for the class action represents an appropriate place to settle the controversy, given the location of the interested parties, the availability of witnesses and evidence, and the condition of the court's calendar.

7A WRIGHT, MILLER, & KANE, *supra,* § 1780, at 572–73 (citations omitted). The present lawsuit was filed as a class action, on behalf of Maryland residents, in the Circuit Court for Baltimore City, a court that has had extensive experience with mass tort lawsuits, namely in the asbestos litigation. *See generally ACandS, Inc. v. Godwin,* 340 Md. 334, 667 A.2d 116 (1995). If this litigation were to proceed as a class action, the Circuit Court for Baltimore City would be as able and appropriate a forum as any Maryland has to offer, especially in light of the large numbers of Maryland residents who might become involved as plaintiffs and the geographically diverse roll of defendants.

Finally, the Circuit Court need assess the manageability of the lawsuit as a class action. In *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 2146, 40 L.Ed.2d 732 (1974), the Supreme Court explained that "this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." As previously discussed, the individual issues in this case would necessitate potentially hundreds of thousands of somewhat extensive individual trials. Such a trial plan hardly promotes judicial economy. Instead, it renders the presently proposed class litigation unmanageable in much the same way as other courts have concluded. *See Emig,* 184 F.R.D. at 393 (ruling that plaintiffs' proposed trifurcated trial plan, virtually identical to Respondents' plan approved by the Circuit Court, would "not further judicial economy because it would necessarily require some type of individual trial for every class member and would greatly complicate the management of the class action"); *Kurczi v. Eli Lilly & Co.,* 160 F.R.D. 667, 681 (N.D.Ohio 1995) ("This action would very likely require an individual hearing for each plaintiff regarding choice of law, another individual hearing regarding causation, and still an-

other regarding damages. This scenario is hardly the picture of judicial economy envisioned by Rule 23."); *In Re Northern Dist. of Cal.,Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847, 856 (9th Cir.1982) ("The few issues that might be tried on a class basis in this case, balanced against issues that must be tried individually, indicate that the time saved by a class action may be relatively insignificant.").

We also note the difficulties of managing a class action when dealing with an "immature tort." This notion, and its applicability to the instant case, can be no better explicated than as by the court in *Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa.1997), a little less than three years ago:

> Another compelling factor that militates against a finding of superiority is that there does not exist "a prior track record of trials from which [this Court] can draw the information necessary to make the ... superiority analysis required by Rule 23." [*Castano v. American Tobacco Co.*, 84 F.3d 734,] 747 [ (5th Cir.1996) ]. The *Castano* court stated that "the certification of an immature tort results in a higher than normal risk that the class action may not be superior to individual adjudication." *Id.* As in *Castano,* this Court concludes that the lack of a prior track record of trials in these types of cases makes it practically impossible to draw information necessary to make the superiority analysis.

> Plaintiffs argue that the "immature tort" theory should not apply in this case because they proceed on well-established causes of action. As an initial matter, the Court questions plaintiffs' characterization with respect to the maturity of the causes of action on which they proceed. Plaintiffs' medical monitoring claim and putative intentional exposure to a hazardous substance claim are relatively new causes of action if you consider the history of the development of tort law. Based just on the relative "maturity" of these particular causes of action, the Court could determine that these torts are immature. The concept of the immature tort however goes far beyond this simplistic analysis.

In the context of Rule 23(b)(3), the immature tort theory has a much broader meaning [than] its mere name would suggest. The immature tort can refer to a new cause of action, or an old cause of action applied to a new situation. *See Id.* at 737; *see also* Recent Case, *Class Certification of Mass Torts—Fifth Circuit Decertifies Nationwide Tobacco Class*: Castano v. American Tobacco Co., 110 Harv. L.Rev. 977, 980 (1997) (opining on the wide variety of meanings that "immature tort" may encompass). For example, in *Castano,* the cause of action was not novel; indeed, the *Castano* plaintiffs proceeded on the ordinary claim that a fraudulent failure to disclose material information resulted in injury to plaintiffs.

The immature nature of the *Castano* plaintiffs' claim arose out of the fact that the plaintiffs were applying old causes of action to a new situation. The new situation was what the *Castano* court called the "addiction-as-injury" theory of liability. In *Castano,* plaintiffs were claiming that defendants' conduct caused them to become addicted to cigarettes, thus exposing them to the enhanced risk of contracting smoking-related diseases. This theory of liability was "novel". Indeed, at the time of *Castano,* no United States Court had ever tried a tobacco suit based on plaintiffs' theory of liability. Because of the novelty of this theory and the lack of prior track record, the court was unable to draw on any information to make its superiority analysis.

In this case, plaintiffs allege that they proceed on a different theory of liability. However, a close reading of plaintiffs' amended complaint indicates that plaintiffs proceed on almost the same theory of liability as did the *Castano* plaintiffs. The plaintiffs' theory of liability directly relies on their being able to prove that cigarettes are addictive, that the class members are addicted, that the defendants knew that the cigarettes were addictive, that despite this knowledge defendants targeted children with advertising for the sole purpose of addicting them, and that defendants' actions were undertaken with the full knowl-

edge that cigarettes contained carcinogens which caused disease. In sum, addiction is central to plaintiffs' theory of liability.

Applying the immature tort theory to this case, the Court finds that plaintiffs cannot demonstrate superiority in this case. The superiority analysis requires a balancing of the merits of the class action against those "alternative available methods," namely individual trials in this case. *See Georgine* [*v. Amchem Products, Inc.*], 83 F.3d [610,] 632 [ (3rd Cir.1996) ]. Any attempt to make a superiority determination in the absence of a prior track record of individual trials is necessarily based on speculation. *See Castano*, 84 F.3d at 748.

*Id.* at 494–95 (footnote omitted) (ellipsis in *Arch* ). *See also Emig*, 184 F.R.D. at 394 ("The court's concern would be lessened if there was a prior track record of individual litigation in Kansas courts that establishes that a class action suit is superior to individual litigation of plaintiffs' claims; however, none is present.").

Indeed, in *Castano* the Fifth Circuit emphasized,

Fairness may demand that mass torts with few prior verdicts or judgments be litigated first in smaller units— even single-plaintiff, single-defendant trials—until general causation, typical injuries, and levels of damages become established. Thus, "mature" mass torts like asbestos or Dalkon Shield may call for procedures that are not appropriate for incipient mass tort cases, such as those involving injuries arising from new products, chemical substances, or pharmaceuticals.

*Id.,* 84 F.3d at 748 (quoting MANUAL FOR COMPLEX LITIGATION § 33.26); *see* Francis E. McGovern, *An Analysis of Mass Torts for Judges,* 73 TEX. L.REV. 1821, 1841–43 (1995) (discussing the life cycle of a mass tort). As we mentioned earlier, there appear to be few, if any, individual tobacco cases currently pending in Maryland courts. In consideration of the contraindications of prosecuting immature torts as a class action, we concur with the *Arch* and *Castano* courts, and

similarly conclude that the manageability factor counsels strongly against the maintenance of this litigation as a class action.[34] As succinctly stated by the Fifth Circuit, "at this time, while the tort is immature, . . . class certification cannot be found to be a superior method of adjudication." *Castano*, 84 F.3d at 740–41. In tandem with the lack of predominance of common issues, the Circuit Court's certification of the classes under Rule 2–231(b)(3) thus represents an abuse of discretion.[35]

---

**34.** We concur with the assessment of the Superior Court of the District of Columbia that the jury verdict for the plaintiffs at the conclusion of Phase I in the case of *Engle v. R.J. Reynolds Tobacco Co.*, No. 94–08273 (Dade County, Fla. Cir. Ct. 11th Jud. Ct. July 7, 1999), does not affect the immaturity of mass tobacco tort litigation. *See Reed v. Philip Morris Inc.*, Civil No. 96–5070, slip op. at 39, 1997 WL 538921 (D.C.Super.Ct. July 23, 1999) (*Reed II*). Nor does the more recent jury award of compensatory damages to the *Engle* class plaintiffs alter the fact that such trial success has yet to survive the full appellate process. *See In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1299–1300 (7th Cir.1995) (advocating preferability of allowing "a final, authoritative determination of [defendants'] liability . . . to emerge from a decentralized process of multiple trials, involving different juries . . . in different jurisdictions" and emphasizing that "the pattern that results will reflect a consensus, or at least a pooling of judgment, of many different tribunals"). There simply is no established track record for the prosecution of the claims that have typically been pursued against the tobacco companies following the Fifth Circuit's decision in *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996), other than the widespread failure to maintain them as class actions. *See* Note, *Decertification of Statewide Tobacco Class Actions*, 74 N.Y.U. L.Rev. 1336, 1354–55 (1999).

**35.** Respondents rely heavily on the fact that, despite the clear trend disfavoring class certification of mass tort lawsuits against tobacco companies, *see supra* Section IV.A., the Circuit Court is not alone in certifying such a lawsuit for proceeding as a class action. These lone ebbs against the countervailing flow of class certification denials and class decertifications confirm, if nothing else, according to Respondents, that judicial review, by way of mandamus, of the Circuit Court's Class Certification Order is unwarranted.

As for the two state cases allowing a tobacco class action to proceed, *R.J. Reynolds Tobacco Co. v. Engle*, 672 So.2d 39 (Fla.Dist.Ct.App. 1996), *rev. denied*, 682 So.2d 1100 (Fla.1996) and *Scott v. American Tobacco Co.*, 725 So.2d 10 (La.Ct.App.1998), *writ denied*, 731 So.2d 189 (La. 1999), we find their reasoning unpersuasive, for the same reasons that two New York courts have discredited their authority. First the New York Appellate Division criticized the *Engle* decision on the

## V. Punitive Damages

Petitioners also take issue with the Circuit Court's proposed treatment of punitive damages under the class action scheme: "In this case, the plaintiffs' trial plan provides for the common issues jury to determine defendants' liability for punitive damages and an appropriate multiplier of any actual damages,

---

ground that "[t]here was no analysis of why the common issues predominated over the individual issues." *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 679 N.Y.S.2d 593, 599 (1998), *aff'd*, 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999). *See also Arch v. American Tobacco Co.*, 175 F.R.D. 469, 485 n. 12 (E.D.Pa.1997) (describing *Engle* opinion as "devoid of a thorough analysis of the requirements which must be satisfied before a class is certified"). In fact, the trial court in *Engle* itself, even after its decision to grant class certification was affirmed by Florida's intermediate appellate court, yet modified from nationwide membership to statewide membership, *see Engle*, 672 So.2d at 42, later acknowledged problems with treating the case as a class action. Specifically, the court conceded that "after three years of pretrial proceedings it has become evident that the individual hearings for each class member may be more extensive than was originally envisioned by the [intermediate appellate court]," *Engle v. R.J. Reynolds Tobacco Co.*, No. 94–08273 CA–20, slip op. at 3 (Dade County, Fla. 11th Jud. Cir. Ct. Feb. 3, 1998), and professed its "reservations about the manageability of this case as a result of increased emphasis on individual issues," *id* at 4.

Secondly, in denying a motion for class certification against several tobacco manufacturers in a lawsuit pleading thirteen causes of action, the Supreme Court, Queens County, New York disparaged and distinguished the *Scott* case as follows:

In *Scott v. American Tobacco Co.*, 725 So.2d 10 (1998), the Court of Appeals of Louisiana, Fourth Circuit, certified a tobacco case brought on a claim of medical monitoring. The court said, "In the instant case we are concerned basically with one substance only, nicotine, and one effect only, addiction." (*Scott v. American Tobacco Co.*, *supra*, at 13.) However, most jurisdictions are of the view that addiction is a highly individual issue and the Louisiana court's impression that the tobacco case involved a mass tort arising from a common cause finds no support in other reported cases. A tobacco case does not involve a mass tort arising from a single accident or catastrophic event. Moreover, in the Louisiana medical monitoring case, a plaintiff would have to prove that as a proximate result of exposure to a substance he suffered a significantly increased risk of contracting a serious latent disease. This is a far less difficult and far less individualistic burden of proof than that faced by a plaintiff in the case at bar where proximate causation of his specific disease must be proven.

*Geiger v. American Tobacco Co.*, 181 Misc.2d 875, 696 N.Y.S.2d 345, 349 (N.Y.Sup.Ct.1999) (citations to cases other than *Scott* omitted).

*which would be determined by other juries."* (Cir. Ct. Mem. Op. at 56 (emphasis added)). Petitioners contend that by artificially separating, indeed splitting between different juries, the determinations of liability for punitive damages from liability for actual damages, the Circuit Court's Class Certification Order contravenes Maryland law and violates their constitutional rights to due process.[36] Further, Petitioners

---

**36.** Because of our resolution of other issues presented in the instant petition for writ of mandamus, we need not decide any of the constitutional claims raised by Petitioners, including their assertion that the Circuit Court's proposed trial scheme violates their right to a jury trial under the Maryland Constitution. We note, however, that the possibility that the Circuit Court's trial plan may well portend problems in assuring Petitioners the full scope of their jury trial right further militates against certification of the present case for class action treatment. *See Reed v. Philip Morris Inc.*, Civil No. 96–5070, slip op. at 41 (D.C.Super.Ct. July 23, 1999) (*Reed II* ) (while determining that a ruling on the Seventh Amendment concerns presented by Plaintiffs' proposed multi-phase trial plan was unnecessary, stating that the plan's "potential constitutional problems present an additional reason to conclude that class certification is not warranted"). As to the actual presence of constitutional concerns in the instant case, it is true that the Seventh Amendment is inapplicable against the States. *See Bringe v. Collins*, 274 Md. 338, 341, 335 A.2d 670, 673 (1975) (stating that "the Supreme Court of the United States has consistently held that the Seventh Amendment is not incorporated into the Fourteenth Amendment, and consequently is not applicable to state court proceedings"); *see also Minneapolis & St. L.R. Co. v. Bombolis*, 241 U.S. 211, 219–220, 36 S.Ct. 595, 597, 60 L.Ed. 961 (1916). Nonetheless, this Court has made clear that

> Maryland's Constitution, Article XV, section 6, which provides that "[t]he right of trial by Jury of all issues of fact in civil proceedings . . . shall be inviolably preserved," like the seventh amendment to the Constitution of the United States, requires that "enjoyment of the right . . . be not obstructed, and that the ultimate determination of issues of fact by the jury be not interfered with." *In re Peterson*, 253 U.S. 300, 310, 40 S.Ct. 543, 546, 64 L.Ed. 919 (1920) (Brandeis, J.).

*Attorney General v. Johnson*, 282 Md. 274, 291, 385 A.2d 57, 67 (alteration and ellipses in *Johnson* ), *appeal dismissed*, 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978), *disapproved of on other grounds, Newell v. Richards*, 323 Md. 717, 594 A.2d 1152 (1991). The Supreme Court has held the Seventh Amendment to entitle parties in a civil suit to have related facts and issues decided by a single jury, thus prohibiting a second jury from reexamining the same facts and issues. *See Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 499–501, 51 S.Ct. 513, 514–15, 75 L.Ed. 1188 (1931). Multiphasic class action trial plans have been held to run afoul of this constitutional principle. *See*

argue that Maryland law does not permit the use of multipliers for calculating punitive damages awards.[37]

In recent years, this Court has on numerous occasions discussed the law of punitive damages. Yet we have not specifically analyzed the applicability of punitive damages to class action suits where liability determinations are separated from the consideration of punitive damages, nor have we addressed directly the use of punitive damages multipliers in any setting.[38] Nonetheless, several of our opinions are instructive on the essential features underlying an award of

---

*Castano v. American Tobacco Co.*, 84 F.3d 734, 751 (5th Cir.1996); *In re Rhone–Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302–03 (7th Cir.1995). Consequently, there exists cause for constitutional concerns where the trial plan endorsed by the Circuit Court in this case would potentially bifurcate between two separate juries such interrelated issues as negligence and contributory negligence; negligence and assumption of the risk; strict liability and assumption of the risk; fraud and reliance; fraud and statute of limitations; general causation and individual causation; addiction and contributory negligence; addiction and assumption of the risk; compensatory damages and punitive damages; and, finally, Petitioners' conduct and proximate cause.

**37.** Treatise authors Newberg and Conte describe punitive damages multipliers in the following manner:

> The imposition of punitive damages in a *common issues* trial has been approved when the jury is permitted to assess punitive damages not as an aggregate award to the class, but rather as a ratio of any compensatory damage award made to individual class members. This is the so-called *multiplier* award.

3 Herbert Newberg & Alba Conte, Newberg on Class Actions, § 17.28A (Cum.Supp.1999), at 205.

**38.** While reviewing the consolidated asbestos litigation, we found it unnecessary to decide the validity of punitive damages multipliers, yet noted as follows:

> Phases III and IV [of the trial plan] were concerned with liability for punitive damages and the punitive damages multipliers. Special attention has been directed by the defendants to the validity of treating punitive damages as a common issue, but we need not consider those ·arguments in view of our holding that there was insufficient evidence for punitive damages.[20]
>
> \* \* \* \* \* \*
>
> [20] The absence of any discussion of the use of multipliers does not indicate this Court's approval of their use.

*ACandS, Inc. v. Godwin*, 340 Md. 334, 392 and n. 20, 667 A.2d 116, 144 and n. 20 (1995).

punitive damages as well as on the viability of utilizing punitive damages multipliers in this State.

■ First, a jury must find compensatory damages as a foundation before it may award punitive damages. In *Caldor v. Bowden*, 330 Md. 632, 625 A.2d 959 (1993), this Court stated:

> There are two threshold conditions that parties must meet before being entitled to receive an award of punitive damages. The first condition is that there be a compensatory damages award underlying an award of punitive damages.[39]

> \* \* \* \* \* \*

> Our prior decisions indicate that there must be a compensatory damages award foundation for *each* count of a complaint that provides a basis for punitive damages.

> \* \* \* \* \* \*

> [O]ne of the purposes of punitive damages is to punish the wrongs of the defendant. The requirement of a compensatory damages foundation protects defendants from being punished for acts that the trial court determines the defendant did not commit.

*Id.* at 661–63, 625 A.2d at 973–74 (citation omitted). *See also Montgomery Ward v. Wilson*, 339 Md. 701, 730, 664 A.2d 916, 930 (1995) (reconfirming that "an award of compensatory damages must underlie any award of punitive damages in Maryland"); *Shell Oil Co. v. Parker*, 265 Md. 631, 644, 291 A.2d 64, 71 (1972) (holding that "to support an award of punitive damages in Maryland there must first be an award of at least nominal compensatory damages").

■ Second, even where the evidence warrants punitive damages, it is within the sound discretion of the trier of fact to

---

**39.** "The second condition required to support punitive damages is that the tort be committed with malice." *Caldor v. Bowden*, 330 Md. 632, 661, 625 A.2d 959, 973 (1993).

award or deny such damages. In *Scott v. Jenkins*, 345 Md. 21, 690 A.2d 1000 (1997), this Court stated that "unlike consequential damages, 'the trier of fact has ... discretion to deny punitive damages even [where] the record would otherwise support their award.'" *Id.* at 36, 690 A.2d at 1007 (quoting *Adams v. Coates*, 331 Md. 1, 15, 626 A.2d 36, 43 (1993)). Along the same lines, this Court has also repeated the "generally accepted rule that punitive damages are not recovered as a matter of right, even though the facts of the case may be such as to make their allowance proper, but rather, that their allowance rests in the sound discretion of the trier of fact, be it court or jury." *Nast v. Lockett*, 312 Md. 343, 349, 539 A.2d 1113, 1116 (1988) (internal quotation marks, brackets and citation omitted), *overruled on other grounds, Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992).

Finally, in the case of *Kneas v. Hecht Co.*, 257 Md. 121, 262 A.2d 518 (1970), we characterized the nature of compensatory damages as an indispensable precondition to punitive damages in a fashion more directly relevant to the issue of separating the determinations of the two species of damages: " It is well settled that in order to support an award for punitive damages compensatory, or actual damages must first be found. Thus punitive damages are clearly dependent and can hardly be decided in a vacuum...." *Id.* at 125, 262 A.2d at 521 (citations omitted).

Respondents argue that because punitive damages are focused purely on the defendants' conduct, they may be determined in the Phase I class trial without regard to the liability of Petitioners to any class member. It is true, as Respondents suggest, that the purpose of a punitive damages award is to punish the defendant, and that such an award does not depend in any way upon the plaintiff's conduct. We reconfirmed this principle less than a decade ago, stating that the " 'purposes of punitive damages relate *entirely* to the nature of the defendant's conduct' " and "the availability of a punitive damages award ought to depend upon the heinous nature of the defendant's tortious conduct." *Zenobia*, 325 Md.

at 454, 601 A.2d at 649 (emphasis added) (quoting *Schaefer v. Miller*, 322 Md. 297, 321, 587 A.2d 491, 503 (1991)). We have also explained,

> Rather than representing a specific monetary loss by the plaintiff, punitive damages embody a public policy determination that a particular defendant engaged in heinous and malicious conduct sufficient to warrant the equivalent of a "civil penalty." It has no necessary relation to the loss suffered by the plaintiff, but rather depicts the degree of the defendant's culpability and his ability to pay.

*Scott*, 345 Md. at 36, 690 A.2d at 1007 (citation omitted). Nonetheless, that the focus of punitive damages lies upon defendants and their conduct does not change the fact that, as demonstrated from the precedents excerpted above, there is clearly established Maryland law prohibiting an award of punitive damages made without regard to the actual compensatory damages to be awarded.

Respondents, however, would have us instead look to other jurisdictions that have endorsed the use of punitive damages multipliers for complex tort litigation. In particular, they point to certain decisions within the Fifth Circuit, upon which the Circuit Court rested its approval of the use of punitive multipliers in prosecuting the present case as a class action. In *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468 (5th Cir.1986), the court stated:

> Defendants contend that, under Texas law, punitive damages cannot be determined separately from actual damages because the culpability of their conduct must be evaluated relative to each plaintiff. We disagree.
>
> The purpose of punitive damages is not to compensate the victim but to create a deterrence to the defendant, and to protect the public interest.... The focus is on the defendant's conduct, rather than on the plaintiff's. While no plaintiff may receive an award of punitive damages without proving that he suffered actual damages, the allocation need not be made concurrently with an evaluation of the defen-

dant's conduct. The relative timing of these assessments is not critical.

*Id.* at 474 (citations omitted).

In the case of *In re Shell Oil Refinery,* 136 F.R.D. 588, 593–94 (E.D.La.1991), *aff'd, sub nom. Watson v. Shell Oil Co.,* 979 F.2d 1014 (5th Cir.1992), *reh'g en banc granted,* 990 F.2d 805 (5th Cir.1993), *appeal dismissed,* 53 F.3d 663 (5th Cir.1994), the trial court, guided by the rationale stated in *Jenkins,* adopted a class action trial plan for the prosecution of claims arising out of a 1988 explosion whereby a common issues jury would determine the defendants' liability for punitive damages, if any, in terms of an amount of money for each dollar of compensatory damages to be awarded individual plaintiffs by a later, separate jury. Hence, the common issues jury was to establish a punitive damages multiplier for the Court to utilize in computing and ordering punitive damages for those plaintiffs ultimately successful in proving actual damages. *See Shell Oil Refinery,* 136 F.R.D. at 593. *See also Cimino v. Raymark Industries, Inc.,* 151 F.3d 297, 327 (5th Cir.1998) (relying on *Jenkins,* acknowledging propriety of punitive damages award based upon multiplier yet holding that one co-defendant could not be held jointly liable for punitive damages award separately assigned to other co-defendant).

Respondents have also cited *Day v. NLO, Inc.,* 851 F.Supp. 869 (S.D.Ohio 1994), in which case the court stated:

The only other class wide verdict which we envision allowing the jury to render, if appropriate, is for punitive damages. Of all the issues to be decided in this case, the issue of punitive damages is the least dependent upon the individual differences between Plaintiffs. Punitive damages are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence. As one district court has stated:·

Punitive damages are not measured solely by the bodily injury suffered by a plaintiff, rather imposition of punitive damages is determined according to other factors such as

the outrageousness of the injurious act, the defendant's motives and intent, and the nature and extent of the harm to the plaintiff.

The award of punitive damages focuses upon the conduct of the Defendants. In this case that proof, as we have noted, is very similar to the issue of liability for intentional tort. Therefore, for the same reasons it is fitting that the question of punitive damages be determined class wide.

*Id.* at 884–85 (internal quotation marks and citations omitted). *See also In Re Diamond Shamrock Chemicals Co.,* 725 F.2d 858, 862 (2d Cir.1984) (refusing to issue writ of mandamus to compel trial court to vacate its certification of mandatory class under Federal Rule 23(b)(1)(B) relating to punitive damages).

Finally, Respondents direct our attention to *In Re Air Crash Disaster at Stapleton International Airport,* 720 F.Supp. 1455 (D.Colo.1988), where the court stated:

Consolidation of liability and punitive damage issues avoids the potential that disparate liability verdicts will be imposed on defendants . . . for the same conduct. The liability phases of individual trials would involve identical evidence and standards of conduct.

Issues of liability and damages are bifurcated pursuant to Rule 42(b). Common issues of liability and punitive damages are consolidated for an exemplar trial pursuant to Rule 42(a).

*Id.* at 1459 (footnotes omitted).

▮ It is clear from these cases that other jurisdictions have approved of the use of punitive damages multipliers, as well as the separation of the determination of punitive damages from that of compensatory damages. This does not change the fact that punitive damage multipliers applied in the manner proposed are in direct contradiction to Maryland law for the same reasons that considerations of compensatory and punitive damages may not be bifurcated in wholesale fashion and across multiple juries. Allowing a single jury to set irrevocably the amount of punitive damages to be imposed relative to and on behalf of several, let alone thousands of

individuals, whose actual damages are themselves determined separately from each other, does not enable the jury to properly assess the amount of punitive damages that are appropriate in specific relation to differing amounts of—and reasons for—actual damages. Mere widespread, identical proportionality between actual damages and punitive damages for such a multitude of plaintiffs would not necessarily encapsulate the relation between the two types of damages deemed requisite under this State's common law. Consequently, the cases cited by Respondents in support of punitive damage multipliers are inapposite in light of established Maryland law.

For all the reasons outlined above, we fully concur with Petitioners' assessment that the Circuit Court's treatment of punitive damages was error:

> Under the Circuit Court's decision, ... the punitive damages determination would be made *before* any finding of liability to any class member, in the absence of any evidence that defendants' conduct actually caused any class member's alleged injury, and without any knowledge of how much, if any, compensatory damages would be awarded to any class member by *other* juries who would never hear the Phase I evidence. This procedure, therefore, contravenes the bedrock requirements of Maryland substantive law.

(Petition at 41.)

## VI. Medical Monitoring

The Circuit Court certified Respondents' medical monitoring claim under Rule 2–231(b)(2), which provides for class certification as follows:

> (b) **Class actions maintainable.** Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:
>
> * * * * * *
>
> (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

The corresponding federal rule has been characterized as instituted primarily for civil rights litigation, although it is not limited to such actions. *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997); *Baby Neal v. Casey,* 43 F.3d 48, 58–59 (3rd Cir.1994).

Noting that this Court has never addressed the question of whether medical monitoring is cognizable in Maryland, (Cir. Ct. Mem. Op. at 64), the Circuit Court concluded that a cause of action for medical monitoring exists in Maryland, accepting "the elements for the maintenance of a medical monitoring claim," *id.* at 67, based upon the reasoning set out in *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829 (3rd Cir.1990) (*Paoli I* ), *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3rd Cir.1994) (*Paoli II* ), and *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970 (Utah 1993). The Circuit Court then determined that the medical monitoring relief sought by the plaintiffs was within the scope of a Rule 2–231(b)(2) class action. Specifically, the court found:

> For the purposes of class certification, the plaintiffs have alleged systematic and continuous conduct by the defendants which has exposed the plaintiffs to numerous toxic substances. As a result of this alleged exposure, plaintiffs have an increased risk of contracting serious disease and injury. If the plaintiffs in this case ultimately prove their allegations, the class members will be entitled to injunctive relief in the form of an extensive court-supervised medical monitoring program. Therefore, because plaintiffs have alleged with particularity a common course of conduct by the defendants against the entire putative class, the Court concludes that the party opposing class certification has allegedly acted on grounds generally applicable to the class for which final injunctive relief with respect to the class as a whole is warranted.

(Cir. Ct. Mem. Op. at 67–68 (footnote and citation omitted)).

This Court has never considered whether a demonstrated need for medical monitoring creates a valid cause of action in

Maryland or generates a permissible form of relief under this State's more traditional tort actions, although several courts around the country more than a decade and a half ago began to consider this type of claim and permitted it to proceed. *See, e.g., Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 746 F.2d 816 (D.C.Cir.1984); *Askey v. Occidental Chemical Corp.,* 102 A.D.2d 130, 477. N.Y.S.2d 242 (1984); *Laxton v. Orkin Exterminating Co.,* 639 S.W.2d 431 (Tenn. 1982). Over the intervening years, several state appellate courts have followed suit in recognizing medical monitoring as a legitimate cause of action or form of relief under their respective tort law. *See, e.g., Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28 (App.1987); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993); *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287 (1987); *Hansen,* 858 P.2d 970 (Utah 1993). Nonetheless, the embrace of medical monitoring as a viable claim has not been universal. *See, e.g., Metro-North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 439–440, 117 S.Ct. 2113, 2121–22, 138 L.Ed.2d 560 (1997) (rejecting particular plaintiff's medical monitoring claim because of lack of compensable injury under Federal Employers' Liability Act and because intermediate court's envisioned potential award of medical monitoring to asymptomatic plaintiff in form of lump sum damages went beyond bounds of "evolving common law" as it now stands); *Ball v. Joy Technologies, Inc.,* 958 F.2d 36, 39 (4th Cir.1991) (ruling that medical monitoring is not cognizable claim under tort law of Virginia or West Virginia absent manifestation of physical injury).

Medical monitoring has been defined as "one of a growing number of non-traditional torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances." *Paoli I,* 916 F.2d at 849. *See also Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition,* 17 A.L.R.5th 327, § 3 (stating that courts have "defined a medical monitoring claim as a claim for the costs of periodic medical examinations to detect latent diseases or disorders caused by

a defendant's culpable conduct, the object of which is to facilitate early diagnosis and treatment of diseases or disorders"). In a claim for medical monitoring, the plaintiff seeks to recover only the quantifiable costs of periodic medical examinations necessary to monitor plaintiffs' health and to facilitate early diagnosis and treatment of disease(s) caused by exposure to chemicals, or as in the instant case, tobacco. *See Ayers,* 525 A.2d at 308; *see also Paoli I,* 916 F.2d at 849 and 850. The theory underlying the recognition of this claim is that the diseases or injuries caused by various toxic substances are often latent, leading to "problems when the claims are analyzed under traditional common law tort doctrine because, traditionally, injury needed to be manifest before it could be compensable." *Id.* at 850. Thus, some courts have recognized medical monitoring claims that permit relief even in the absence of present manifestations of physical injury. *See id.* The injury in a medical monitoring case not being a physical one, it is instead construed as "the 'costs of periodic medical examinations necessary to detect the onset of physical harm.'" *Barnes v. American Tobacco Co.,* 161 F.3d 127, 139 (3rd Cir.1998) (quoting *Redland Soccer Club v. Department of the Army,* 548 Pa. 178, 696 A.2d 137, 144 (1997)); *see also Hansen,* 858 P.2d at 977.[40]

Whether this Court should, as a matter of Maryland common law, recognize medical monitoring, either as a distinct cause of action or allowable form of relief, is a question not easily answered, and one that no doubt will be recurring. In the context of a toxic tort suit involving claims for damages

---

**40.** A cause of action for medical monitoring differs from the cause of action commonly referred to as "an enhanced risk claim." *See Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition,* 17 A.L.R.5th 327, § 3 (explaining that "an action for medical monitoring seeks to recover only the quantifiable costs of periodic examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur"). *See also In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 850 (3rd Cir.1990) (*Paoli I* ); *Ayers v. Jackson,* 106 N.J. 557, 525 A.2d 287, 304 (1987).

sustained because plaintiffs' well water was contaminated by toxic pollutants, the Supreme Court of New Jersey, noting the difficulty that both law and science experience in attempting to deal with the emerging complexities of industrialized society and the consequent implications for human health, observed:

> Our evaluation of the enhanced risk and medical surveillance claims requires that we focus on a critical issue in the management of toxic tort litigation: at what stage in the evolution of a toxic injury should tort law intercede by requiring the responsible party to pay damages?

*Ayers,* 525 A.2d at 298.

We need not resolve this matter today but shall instead leave for the future whether, under Maryland law, plaintiffs could maintain a cause of action or claim to relief to recover the expense of medical surveillance. Whether medical monitoring is a cognizable claim under the tort law of this State is in no way ripe for our consideration at this stage of the litigation: even should this novel tort theory constitute a valid cause of action or form of relief in Maryland, an equitable relief class action should never have been certified on the basis of such a claim under the circumstances of this case.

The claim for medical monitoring should not have been certified under Rule 2–231(b)(2) for two significant reasons. First, the claim as set out in Respondents' Fourth Amended Complaint is primarily for money damages and not for injunctive relief. Certification under subsection (b)(2) is appropriate only where injunctive relief is the sole or primary relief sought. *See Barnes,* 161 F.3d at 142; 1 NEWBERG, *supra,* § 4.11, at 4–39. It does not extend to cases in which the relief prayed relates exclusively or predominately to money damages. *See* Federal Rule 23 Committee Note, *supra,* 39 F.R.D. at 102 (explaining that Federal Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages"). *See also In re School Asbestos Litig.,* 789 F.2d 996, 1008 (3rd Cir.1986); *Smith v. Brown & Williamson Tobacco Corp.,* 174 F.R.D. 90,

99–100 (W.D.Mo.1997); *Castano v. American Tobacco Co.*, 160 F.R.D. 544, 551–52 (E.D.La.1995), *rev'd on other grounds*, 84 F.3d 734 (5th Cir.1996).

In *Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa. 1997), the court offered the following rationale in analyzing plaintiffs' claim for medical monitoring and rejecting their motion for certification of a class action on behalf of Pennsylvania smokers against tobacco companies under Federal Rule 23(b)(2):

> The Court finds that it may properly certify a medical monitoring claim under Rule 23(b)(2) when the plaintiffs seek such specific relief which can be properly characterized as invoking the court's equitable powers. In reaching this decision, the Court perforce rejects defendants' argument that a medical monitoring claim can never be characterized as injunctive.
>
> The dispositive factor that must be assessed to determine whether a medical monitoring claim can be certified as a Rule 23(b)(2) class is-what type of relief do plaintiffs actually seek. If plaintiffs seek relief that is a disguised request for compensatory damages, then the medical monitoring claim can only be characterized as a claim for monetary damages. In contrast, if plaintiffs seek the establishment of a court-supervised medical monitoring program through which the class members will receive periodic examinations, then plaintiffs' medical monitoring claim can be properly characterized as a claim seeking injunctive relief.

*Id.* at 483 (citations omitted). *See also Barnes*, 161 F.3d at 142. The court ultimately concluded that the claim for medical monitoring could not "be properly certified under [Federal] Rule 23(b)(2) but must satisfy the requirements of Rule 23(b)(3)." *Arch*, 175 F.R.D. at 485.

In their Fourth Amended Complaint, Respondents demand that "Defendants be ordered to create a medical monitoring fund, under the continuing jurisdiction and supervision of the Court, to monitor the health of Plaintiffs and Class members and to *pay or reimburse Class members for all medical*

*expenses* caused by Defendants' wrongdoing," *id.* at ¶ 301(d) (emphasis added), seeking reimbursement for treatment of the disease as well as detection. Calling such payment "injunctive relief" does not change the status of the claim from that of a fundamentally monetary nature. The fact that what Respondent plaintiffs are seeking in actuality is nothing more than money damages is likewise belied, first, by their requests for relief within the medical monitoring claim itself, that the court award restitution and disgorgement of profits in addition to the actual medical monitoring costs, *see id.* at ¶ 301(c), and, second, by their final prayer for relief, for "medical monitoring, whether denominated as damages or in the granting of equitable relief," *id.* at 100. Compounded with these requests are the significant compensatory and punitive money damages being sought under Respondents' nine other causes of action.

It is therefore clear that notwithstanding the possibility that a medical monitoring claim might legitimately be framed as one seeking equitable relief, *see Day v. NLO, Inc.,* 144 F.R.D. 330, 336 (S.D.Ohio 1992), that possibility cannot be realized through the instant lawsuit. *See Arch,* 175 F.R.D. at 484 (ruling that Pennsylvania smokers' medical monitoring claim could not be certified under Rule 23(b)(2), first, because its inclusion of a request for treatment rendered the claim "identical to a traditional damage claim for personal injury" that illicitly attempted to "transform a legal claim into an equitable one merely by using a fund as a repository for money damages" and, secondly, "because the overwhelming majority of relief sought by plaintiffs in their entire complaint is monetary in nature"). *See also Smith,* 174 F.R.D. at 100 (rejecting motion for class certification of medical monitoring fund for Missouri smokers because monetary relief was predominant relief being sought); *Harding v. Tambrands,* 165 F.R.D. 623, 632 (D.Kan.1996) (holding that certification under Federal Rule 23(b)(2) for medical monitoring of alleged victims of toxic shock syndrome was inappropriate because primary relief sought was money damages); *Boughton v. Cotter Corp.,* 65 F.3d 823, 828 (10th Cir.1995) (affirming trial court's decision not to certify medical monitoring class because relief sought

was primarily money damages); *Taylor v. American Tobacco Co.*, No. 97 715975 NP, slip op. at 19 (Wayne County, Mich. Cir. Ct. Jan. 10, 2000) (in denying motion for class certification of tobacco lawsuit, ruling that "the medical monitoring aspect of plaintiffs' claims does not truly involve the award of injunctive relief" but rather is "an element of damages").

Class certification of Respondents' medical monitoring claim under Rule 2–231(b)(2) must fail for a second reason. Unlike Rule 2–231(b)(3), Rule 2–231(b)(2) class members are bound by any resulting judgment, given that they are not afforded any opt-out mechanism. Courts have consequently mandated as a condition precedent to certifying an equitable relief class action that it exhibit "cohesiveness," a requirement similar to Rule 2–231(b)(3)'s prerequisite of predominance, yet one that is even more demanding and difficult to satisfy. *See Barnes*, 161 F.3d at 142–43 ("[T]he cohesiveness requirement enunciated by both [the Third Circuit] and the Supreme Court extends beyond Rule 23(b)(3) class actions. Indeed, a(b)(2) class may require more cohesiveness than a(b)(3) class. This is so because in a(b)(2) action, unnamed members are bound by the action without the opportunity to opt out."); *Clay v. American Tobacco Co.*, 188 F.R.D. 483, 495 (S.D.Ill.1999) (stating that a "Rule 23(b)(2) class should actually have more cohesiveness than a Rule 23(b)(3) class"). That the putative class members in this tobacco litigation have been "exposed to different . . . products, for different amounts of time, in different ways, and over different periods . . . make[s] class treatment inappropriate." *Barnes*, 161 F.3d at 143 (internal quotation marks and citation omitted) (first ellipsis in *Barnes* ). This is so because Respondents cannot escape the burden of proving, individually, some *injury*, whether addiction alone or some other medical problem, that was *caused* by Petitioners' misconduct. *See id.* at 144 ("In order to prevail on their medical monitoring claim—under any of their three theories of liability (negligence, strict products liability, and intentional exposure to a hazardous substance)—plaintiffs must demonstrate that defendants *caused* their exposure to tobacco.").

Moreover, the medical monitoring claim may perhaps more accurately be deemed a remedy rather than a distinct cause of action. *See Potter*, 25 Cal.Rptr.2d 550, 863 P.2d at 823 ("Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery."); *Cosentino v. Philip Morris Inc.*, No. MID–L–5135–97, slip op. at 23 (N.J.Super. Ct. Oct. 22, 1998, *recon.*, Feb. 11, 1999). *But see Arch*, 175 F.R.D. at 483–84 n. 11 ("[S]everal states have permitted recovery of damages for medical monitoring as part of the relief. In Pennsylvania, however, medical monitoring is an independent cause of action, not a compensable item of damages." (Citation omitted)); *Redland*, 548 Pa. 178, 696 A.2d 137; *Simmons v. Pacor, Inc.*, 543 Pa. 664, 674 A.2d 232 (1996).[41] Insofar as medical monitoring constitutes only a form of relief, Respondents would still be required to succeed in proving one of their other nine pleaded causes of action. These we have already deemed inappropriate for class action treatment on account of their lack of predominance of common issues over individual ones, a test that is, again, even less stringent than the "cohesiveness" requirement for equitable relief class actions. *A fortiori*, the particular medical monitor-

---

**41.** In *Barnes v. American Tobacco Co.*, 989 F.Supp. 661 (E.D.Pa.1997), the same court that decided *Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa.1997), explained that

there is a theoretical and practical distinction between a medical monitoring fund and a medical monitoring claim. The medical monitoring claim is the plaintiffs' actual cause of action; in order to have the right to a remedy, the plaintiffs must first establish that they have satisfied the seven elements of a medical monitoring fund. In contrast, the medical monitoring fund is the actual relief that will be awarded if the plaintiffs succeed in establishing the claim. The difference between the medical monitoring claim and the medical monitoring fund is highlighted by the fact that plaintiffs ... can prevail on their medical monitoring claim and request monetary damages in lieu of their fund. Indeed, the plaintiffs' first motion for class certification under Rule 23(b)(2) was initially denied because the relief requested under its medical monitoring claim was predominantly monetary damages, not a court-supervised fund.

*Id.* at 667 n. 6.

ing claim pressed by Respondents in this case cannot be maintained as a Rule 2–231(b)(2) class action. The recently expressed sentiments of a trial court in the District of Columbia would seem to apply with similar if not equal force here:

> This Court has already stated that numerous issues, including addiction, causation, reliance, statute of limitations and other defenses, will have to be addressed individually. Those same issues are just as central to a medical monitoring claim as to any of the Plaintiffs['] other claims. Thus even if this Court were to consider certifying this class for medical monitoring under Rule 23(b)(2), it would still fail to qualify under the cohesive requirement.

*Reed v. Philip Morris Inc.*, Civil No. 96–5070, slip op. at 45 (D.C.Super.Ct. July 23, 1999) (*Reed II* ). Finally, for the already determined failure of predominance, the medical monitoring claim could thus not be maintained as a class action even if recast under Rule 2–231(b)(3).

In conclusion, although we do not rule out the possibility that this Court would, in an appropriate case, recognize medical monitoring as a viable cause of action or as an element of damages, we do not believe that a Rule 2–231(b)(2) class action may be certified in this litigation on the basis of such a claim. As in *Arch* and *Smith*, Respondents here primarily are seeking monetary relief in asserting this novel claim. As in *Barnes* and *Reed II*, the causes of action underlying the medical monitoring claim lack the cohesiveness required for the maintenance of a class action lawsuit seeking injunctive or equitable relief.

## VII. Conclusion

Because the Circuit Court's order certifying the present litigation as a class action was inappropriate for the numerous reasons discussed above, we conclude that the instant petition for writ of mandamus should be, and hereby is, granted. An order of mandamus shall issue henceforth from this Court

directing the Circuit Court for Baltimore City to vacate its order of class certification in the case of *Richardson v. Philip Morris Inc.*, No. 96145050/CE212596.[42]

*CLASS CERTIFICATION ORDER OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. COSTS TO BE PAID IN THE PROPORTION OF ONE–FOUR-TEENTH BY RESPONDENT STATE OF MARYLAND,*

---

**42.** Our holding is necessarily limited to the procedural posture and facts before the Circuit Court at the time the court ruled on the motion for class certification. Of course, our holding does not restrict the Circuit Court from addressing, consistent with the principles expressed herein, a class certification motion at a future date. *See Dean Witter Reynolds, Inc. v. Superior Court,* 211 Cal.App.3d 758, 259 Cal.Rptr. 789, 800 (1989) (while issuing writ of mandate to decertify class, explaining that trial court could once again consider certification of class after appropriate amendment of complaint). *Cf. In re Fibreboard Corp.,* 893 F.2d 706, 712 (5th Cir.1990) (after granting writ of mandamus preclud-ing Phase II common trial of over 3000 asbestos cases on·issue of "omnibus" liability to certified class, inviting trial court "to continue its imaginative and innovative efforts to confront these cases"). We would nonetheless encourage the Circuit Court to consider that the use of bellwether cases, whether of the currently proposed representatives or of other well-chosen plaintiffs, may comprise a superior method of adjudicating lawsuits filed by persons allegedly addicted to or injured by the use of Petitioners' tobacco products. *See* FED.R.CIV.P. 23, Adviso-ry Committee Note, *reprinted in* 39 F.R.D. 69, 103 (1966) ("[A]nother method of handling the litigious situation may 'be available which has greater practical advantages. Thus one or more actions agreed to by the parties as test or model actions may be preferable to a class action. . . ."). *See also In re Rhone–Poulenc Rorer, Inc.,* 51 F.3d 1293, 1304 (7th Cir.1995) (observing that "a sample of trials" may make more sense than utilizing the class action device for mass tort cases); *Connecticut Cooling Total Air, Inc. v. Connecticut Natural Gas Corp.,* 46 Conn.Supp. 82, 738 A.2d 1167, 1171 (1999) (in finding that class action form was not "superior to all other available methods for the fair and efficient adjudication of the controversy," suggesting trial court's "case management strategy involving trial of a 'bellwether' case . . . as a potential means of achieving a more prompt trial of issues that may lead to negotiated resolutions of all the cases"); *Taylor v. American Tobacco Co.,* No. 97 715975 NP, slip op. at 22 (Wayne County, Mich. Cir. Ct. Jan. 10, 2000) (in ruling class action inferior method of adjudication for tobacco lawsuit, explaining that litigants with claims of sufficient gravity "are probably better served by the more prompt adjudication of their claims that is possible without the complexities attendant to class action, not the least of which is the possibility of an appeal and reversal of a class action certification" (citing *Amchem*

*THIRTEEN–FOURTEENTHS BY RESPONDENT REP-RESENTATIVE PLAINTIFFS.*

BELL, C.J., RODOWSKY and CATHELL, JJ., dissent.

CATHELL, Judge, dissenting.

I would deny the petition for writ of mandamus and/or prohibition.

"[T]he writ of mandamus is an extraordinary remedy, to be reserved for extraordinary situations ... [and] only 'exceptional circumstances amounting to a judicial "usurpation of power"' will justify issuance of the writ." *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289, 108 S.Ct. 1133, 1143, 99 L.Ed.2d 296 (1988); *see Goodwich v. Nolan*, 343 Md. 130, 146, 680 A.2d 1040, 1048 (1996) ("[J]udicial review is properly sought through a writ of mandamus 'where there [is] no statutory provision for hearing or review *and* where public officials [are] alleged to have abused the discretionary powers reposed in them.'" (second and third alterations in original) (quotation omitted)). Maryland Rule 2–231 entrusts to the trial judge in the first instance the decision to certify a class. This, the trial judge has done in this case. Moreover, that decision has come early in the litigation process.

Under these circumstances, the granting of the petition, in my opinion, negatively impacts the ability of the Circuit Court for Baltimore City to manage its own docket. Just as important, by granting the writ of mandamus and rejecting the trial court's class certification at this early stage of the proceeding, this Court improperly substitutes its discretion for that of the trial judge and, because it does not accord the trial judge the proper deference, tends to undermine the judicial process, Maryland Rule 2–231, and the finality doctrine. In addition, if the circumstances *sub judice* justify issuance of an extraordinary writ, then virtually every certification order will produce a petition for issuance of an extraordinary writ, alleging

---

*Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997))).

perceived problems with the defining of the class. That could, in turn, result in the creation of a "yo-yo" system of class action suits in which no class action will be certified until this Court says it should be.

## I. Writ of Mandamus

As we have seen, the writs of mandamus and prohibition are "extraordinary" writs, which are to be used in only the most extreme cases of discretionary abuse.[1] We addressed the prerequisites of such writs in *Goodwich*, 343 Md. at 145, 680 A.2d at 1047:

> [The writ of mandamus] is "not a substitute for appeal or writ of error." *In re Petition for Writ of Prohibition*, 312 Md. 280, 306, 539 A.2d 664, 676 (1988). It is, however, "an extraordinary remedy[,]" *Ipes v. Board of Fire Commissioners of Baltimore*, 224 Md. 180, 183, 167 A.2d 337, 339 (1961), "that . . . will not lie if [there is] any other adequate and convenient remedy[.]" *A.S. Abell Co. v. Sweeney*, 274 Md. 715, 718, 337 A.2d 77, 79 (1975) (quoting *Applestein v. Baltimore*, 156 Md. 40, 45, 143 A. 666, 668 (1928)). Mandamus is generally used "to compel inferior tribunals, public officials or administrative agencies to perform their function, or perform some particular duty imposed upon them which in its nature is imperative and to the performance of which duty the party applying for the writ has a clear legal right." *Criminal Injuries Compensation Board v. Gould*, 273 Md. 486, 514, 331 A.2d 55, 72 (1975); *see also George's*

---

1. A writ of prohibition is inappropriate in this case. The class action certification order being challenged in this case has already been issued. A writ of prohibition can only be issued to *prevent* the lower court from entering an order. Once an order, including an order for class certification, is entered, the writ is no longer available. *See, e.g., Bates v. McNeil*, 318 Ark. 764, 767, 888 S.W.2d 642, 644 (1994); *Sparkman v. McClure*, 498 So.2d 892, 895 (Fla.1986); *State ex rel. McDonnell Douglas Corp. v. Gaertner*, 601 S.W.2d 295, 296 (Mo.Ct.App. 1980); *State ex rel. Alfred v. Anderson*, 87 N.M. 106, 107–08, 529 P.2d 1227, 1228 (1974); *Mor–Gran–Sou Elec. Coop. v. Montana–Dakota Util. Co.*, 160 N.W.2d 521, 523 (N.D.1968); *State ex rel. Stefanick v. Municipal Ct. of Marietta*, 21 Ohio St.2d 102, 104, 255 N.E.2d 634, 635 (1970).

*Creek Coal & Iron Co. v. County Commissioners,* 59 Md. 255, 259 (1883). The writ ordinarily does not lie where the action to be reviewed is discretionary or depends on personal judgment. [Second, third and fourth alterations in original.]

*See also Board of Supervisors v. County Comm'rs,* 200 Md. 114, 116, 88 A.2d 462, 463 (1952) ("The writ of *mandamus* is an extraordinary remedy afforded to prevent a failure of justice and to preserve peace, order and good government. *Mandamus* is not available except where the petitioner has a clear legal right to compel performance of a certain positive duty by the respondent and where the law affords no other adequate remedy." (citation omitted)); *Pressman v. Elgin,* 187 Md. 446, 451, 50 A.2d 560, 563 (1947) ("[M]andamus ... was issued only by exercise of the extraordinary power of the Crown on proper cause shown.").

Though the writ of mandamus traditionally has served an extremely limited role, this Court has noted the expanded role of the writ in appellate supervisory review:

"Some commentators have said that under what they view as the traditional approach, writs appropriately issue 'only to control actions beyond the jurisdiction of an inferior court, or to compel action that the court lacked power to withhold.' But, according to Wright, in recent times the use of the extraordinary writ has 'broadened to include use of the writs to correct clear abuse of discretion, and more recently ... to satisfy other peculiar needs for interlocutory review.'"

"Earlier commentators, however, recognized that a prerogative writ could issue to control actions of a lower court that were not jurisdictional in nature. As to mandamus, Blackstone asserts that it is designed to 'enforce the due exercise of those judicial ... powers, with which [inferior courts are invested] ... not only by restraining their excesses, but also by quickening their negligence, and obviating their denial of justice.' ... The same remedy is available 'if, in handling of matters clearly within their

cognizance, they transgress the bounds proscribed to them by the laws of England. . . .' "

*In re Petition for Writ of Prohibition,* 312 Md. 280, 306–07, 539 A.2d 664, 676–77 (1988) (citations omitted) (alteration in original).

Thus, the law has evolved so that a writ may be issued by this Court to vacate an order of a lower tribunal that constitutes an "abuse of discretion." In the context of appeal, we have defined an abuse of discretion as an instance "where no reasonable person would take the view adopted by the trial court, or when the court acts without reference to any guiding rules or principles. An abuse of discretion may also be found where the ruling under consideration is clearly against the logic and effect of facts and inferences before the court, or when the ruling is violative of fact and logic." *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110, 118–19 (1997) (internal quotations and alterations omitted).

"Abuse of discretion" sufficient to justify issuance of "extraordinary" writs means more than making an erroneous or illogical decision, however; it is different in magnitude than that required to be shown to obtain reversal on appeal. *In re Catawba Indian Tribe,* 973 F.2d 1133 (4th Cir.1992); *Banov v. Kennedy,* 694 A.2d 850 (D.C.1997). In *Banov,* the District of Columbia Court of Appeals stated that "[a]buse of discretion sufficient for reversal in an appeal is not enough to warrant mandamus; for mandamus to issue, a decision [ (of the lower court) ] must qualify as 'usurpation of judicial power.' " 694 A.2d at 858 (quotation omitted). Similarly, the United States Court of Appeals for the Fourth Circuit has observed that a party seeking mandamus "must make the most difficult showing, that of an abuse of discretion amounting to a usurpation of the judicial power, before mandamus will lie to replace the district court's decision." *Catawba Tribe,* 973 F.2d at 1136; *see also Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374, 1386 & n. 23 (11th Cir.1998) (referring to the "clear abuse of discretion" standard: "A district court's class certification decision, in and of itself, will constitute a 'clear usurpation of

power' or a failure to carry out a ministerial task only in the most unusual of circumstances.").

Thus, a trial court's order granting class certification, even if incorrect and even if the facts are as are alleged by petitioners, without more, should not trigger the granting of an extraordinary writ. Otherwise, there will be a significant further expansion of the extremely limited use of extraordinary writs by appellate courts for regulatory purposes. The Missouri Court of Appeals, in *State ex rel. Byrd v. Chadwick*, 956 S.W.2d 369, 376 (Mo.Ct.App.1997), stated: "In [issuing the writ], we do not direct the trial court as to how it will exercise its discretion, but rather direct it as to what determinations it must make, and then allow it to make those determinations following issuance of our writ." The Tennessee Supreme Court has agreed. *See Meighan v. United States Sprint Communications Co.*, 942 S.W.2d 476 (Tenn.1997) [hereinafter *Meighan II* ]. (Quoting 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 742, at 7–128 to 7–129 (3d ed.1992)), the *Meighan II* court stated:

> Mandamus is appropriate for abuses of discretion, rather than misinterpretations of questions of law. It may lie if the [trial] court, in determining propriety of the class action, acts outside its jurisdiction, without regard to applicable procedural safeguards, or applies or refuses to apply the criteria of [Federal] Rule [of Civil Procedure] 23 in an arbitrary manner.[2] However, if a district court has acted within its jurisdiction according to procedural safeguards and applies the criteria of Rule 23 in a nonarbitrary manner, mandamus is inappropriate to secure a de novo review of the ruling on the class.

*Meighan*, 942 S.W.2d at 481; *cf. In re NLO, Inc.*, 5 F.3d 154, 159–60 (6th Cir.1993) ("Assuming *arguendo* that the district court's certification under [Federal] Rule [of Civil Procedure] 23(b)(2) is erroneous, it is not so clearly erroneous ... that mandamus is the proper remedy.").

---

**2.** Maryland Rule 2–231 is derived from Federal Rule of Civil Procedure 23.

Some of the cases relied upon by petitioners in this case provide examples of trial courts applying class action criteria in an arbitrary manner. The class certification order in *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1076–77 (6th Cir.1996), indicated that the plaintiffs had proven the "commonality" element because they had "a common right to assert a claim against [d]efendants" and the "typicality" element because "all plaintiffs allege[d] injury" by the defendants' products. The Sixth Circuit granted the writ, holding that the trial court order was so vague as to constitute a "disregard of the federal rules." *Id.* at 1088, 1090.

*Ex Parte Green Tree Financial Corp.*, 684 So.2d 1302, 1307 (Ala.1996), involved a class certification in which the trial court "entered an order based upon little or no evidentiary underpinnings." The Alabama Supreme Court was concerned that the order "merely parrot[ed]" the language of the class action rule and had illegally ordered both a mandatory and an "opt-out" class. *Id.* It held, relying in part on its earlier decision in *Ex Parte Blue Cross & Blue Shield*, 582 So.2d 469, 476–77 (Ala.1991), in which mandamus was issued to vacate an order for certification when neither party moved to proceed by way of class action or produced any evidence to justify so proceeding, that such circumstances warranted the granting of a writ. *See Ex Parte Green Tree*, 684 So.2d at 1305.

In these cases, there was a blatant disregard of the applicable rule. Following their teaching, this Court should issue the writ only upon a blatant disregard of Maryland Rule 2–231. There was no blatant disregard of Maryland Rule 2–231 in this case. On the contrary, the circuit court reviewed, and applied, the procedural elements of that rule to the circumstances of the multiple claims before it. It simply did not abuse its discretion to so extreme an extent as to constitute an usurpation of judicial power. As I perceive it, whether the trial court made the *correct* choice, which is, in part, what the majority focuses on, is not yet properly before us.

## II. Trial Court Discretion

The only guidance provided to this State's circuit court judges to assist them in determining whether to certify a class

is contained in Maryland Rule 2–231. That Rule requires trial judges to exercise independent judgment in making that decision. It is not in the interest of the Maryland judicial system to discourage trial judges from utilizing discretion when applying basic procedural rules. The wording of Rule 2–231, the history of its adoption, and the relevant case law make it apparent that that is not what this Court intended when it adopted the Rule. Accordingly, striking of the trial court's class certification at this stage of the proceedings is inappropriate.

Rules of practice and procedure are interpreted in the same manner as a statute, that is, the same canons of construction apply in both cases. *See, e.g., State v. Bell,* 351 Md. 709, 717, 720 A.2d 311, 315 (1998); *New Jersey v. Strazzella,* 331 Md. 270, 274, 627 A.2d 1055, 1057 (1993). Thus,

> "[t]he cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). Legislative intent must be sought first in the actual language of the statute. Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts normally do not look beyond the words of the statute to determine legislative intent.

*Id.* at 717–18, 720 A.2d at 315 (some citations omitted).

Maryland Rule 2–231(c) states:

> (c) *Certification.* On motion of any party or on the court's own initiative, the court shall determine by order as soon as practicable after commencement of the action whether it is to be maintained as a class action. A hearing shall be granted if requested by any party. The order shall include the court's findings and reasons for certifying or refusing to certify the action as a class action. The order may be conditional and may be altered or amended before the decision on the merits.

The rule is plain and unambiguous. Rule 2–231 not only grants trial judges discretion to certify class actions, but it directs them to: "determine by order as soon as practicable

after commencement of the action whether it is to be maintained as a class action." *Id.* As worded, subsection (c) clearly demonstrates the intent of this Court to give trial judges the discretion and authority to certify class actions. Rule 2–231(c) also provides guidelines for a trial judge to follow in ordering or denying class certification: the court's findings and reasons for certifying or refusing to certify the action as a class action must be included in the court's order. Whether correct or not in this case, the trial judge's memorandum opinion concerning the class certification, clearly undertakes to address the procedural aspects of this rule.

Maryland Rule 2–231(c), by providing that the "order may be conditional and may be altered or amended before the decision on the merits," also addresses concerns and questions that may arise as to the size, limitations and management of the class. It allows a trial court to expedite litigation of a class action when the parameters of the class have not yet been finalized. The Rule contemplates, in other words, that the determination of class certification be under the *continued* scrutiny of the trial judge. Thus, the trial court is given discretion, and is expected, to expand or whittle down the class as it sees fit; it is given the ability to amend a certified class to more appropriate limits, as circumstances occurring during the pre-trial proceedings dictate. Therefore, rather than a petition for an extraordinary writ, the better corrective measure for an oversized or inaccurate class is a motion, directed to the trial judge, to amend the certification order.

"The ... language [of the Rule] is not read in isolation, but 'in light of the full context in which [it] appear[s], and in light of external manifestations of intent or general purpose available through other evidence.'" *Stanford v. Maryland Police Training & Correctional Comm'n*, 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (alterations in original) (quoting *Cunningham v. State*, 318 Md. 182, 185, 567 A.2d 126, 127 (1989)). Looking at it in light of the full context in which it appears, Title 2, "Civil Procedure—Circuit Court," reveals that Rule 2–231, by design, contemplates that the circuit court exercise discretion in making the decision that the rule addresses. Without any

doubt, the all-inclusive wording of Maryland Rule 2–231 places the determination, in the first instance, of class certification with the circuit court judges.

"When we pursue the context of statutory language, we are not limited to the words of the statute as they are printed.... We may and often must consider other 'external manifestations' or 'persuasive evidence,' including a bill's title and function paragraphs, amendments that occurred as it passed through the [enactment process], its relationship to earlier and subsequent [rules], and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case."

*Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628, 632–33 (1987).

The history of Rule 2–231's promulgation provides additional evidence of its intended meaning. In the early 1960's, this Court adopted Maryland Rule 209, thereby addressing the need for a class action. *See generally* Memorandum from Neil Tabor to William H. Adkins and Clinton Bamburger on Class Actions (June 16, 1961) (on file with the Rules Committee). "[T]he primary purpose of this rule is to overcome the impracticalities of overtly cumbersome joinder requirements." *Kirkpatrick v. Gilchrist,* 56 Md.App. 242, 249, 467 A.2d 562, 566 (1983); *see also* Tabor Memorandum, *supra.* The Court of Appeals Standing Committee on Rules of Practice and Procedure (the Rules Committee) patterned Maryland Rule 209, not after Federal Rule of Civil Procedure 23, but after a generally formatted proposal for a similar rule in New York. *See* Minutes of the Rules Committee, at 25 (May 11–12, 1979). Rule 209 was adopted to codify the right to maintain a class action, as the Rules Committee recommended, and, so, this Court used general, rather than specific language. *See* Md. Rule 209 (1982).

In the early 1980's, the Rules Committee proposed changes to the rule designed to eliminate jurisdictional and statutory shortcomings, eventually resulting in the adoption of the pres-

ent rule. Minutes of the Rules Committee, at 14–16 (Nov. 21, 1980). The overriding goal of the proposal was to ensure a class certification process "generally requiring that a judge should give early consideration to the question of whether a class action should be maintained. The timing of this determination could be left to the trial judge's discretion." *Id.* at 19.

It is apparent from this history that the rule was recommended and adopted as a tool for the trial court to advance efficiency by (1) allowing class actions and (2) giving the trial courts the power to administer them. It is clear that it was the intention that the trial court's class certification decision be given due deference. Expedition of litigation is an expected result of increased court efficiency. Yet, granting the writ requested here subjects the class certification decision to the possibility of being bogged down immediately in a pretrial appellate process seeking mandamus review. That is counterproductive and inconsistent with the intent of Rule 2–231.

This Court and the Court of Special Appeals both have previously interpreted the rule as giving great deference, at least at the preliminary stages, to a trial judge's class certification decision. In *Bender v. Secretary, Maryland Department of Personnel,* 290 Md. 345, 430 A.2d 66 (1981), the issue was whether certain parties were necessary parties and, thus, had to be added by amendment or class certification. Rather than answering that question ourselves, we remanded the case to the trial court for a decision as to whether a class certification was appropriate. *Id.* at 356, 430 A.2d at 72–73. This Court then acknowledged that the determination whether class certification is appropriate is a question better left, at least initially, to the trial judge's discretion.

The same rationale was later utilized by the Court of Special Appeals in *Kirkpatrick, supra.* That court held that a trial judge should not have dismissed an action based on lack of necessary parties without also ruling on a motion for class action certification. "The message suggested to us by *Bender* apropos to our present concern, is that the trial judge should have decided appellee['s] renewed request for ruling on class

action before or concurrently with the ruling on the appellants' motion for preliminary relief predicated upon want of necessary parties." 56 Md.App. at 250, 467 A.2d at 566.

The Court of Special Appeals logically concluded that certification of a class is an issue initially left to the trial judge. Following *Bender,* the intermediate appellate court remanded the case, allowing the trial court to determine whether class certification was appropriate. Although, in that regard, the court suggested courses of action for the trial judge to take after determining whether the certification was appropriate, *id.* at 250–51, 467 A.2d at 567, it was clear in stating that, on that score, it "by no means suggest[ed] the conclusion to be reached . . . ." *Id.*

*Bender* and *Kirkpatrick* illustrate that Maryland's appellate courts have resisted treading, prior to finality, on territory generally left to the discretion of the trial court, absent extraordinary circumstances amounting to a usurpation of power. In both cases, the appellate courts treated the class certification decision as a discretionary matter to be decided by the trial judge.

Petitioners rely heavily on *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), a case in which the Supreme Court overturned a trial court order that hastily certified a class for settlement purposes without properly analyzing and applying the class action rule. That case, however, is distinguishable. In *Amchem Products,* the Supreme Court feared that the trial judge did not use *any* discretion in certifying the class because "within the space of a single day . . . the settling parties . . . presented to the District Court a complaint, an answer, a proposed settlement agreement, and a joint motion for conditional class certification." *Id.* at 601–02, 117 S.Ct. at 2239, 138 L.Ed.2d 689. The Supreme Court's concern in *Amchem Products* was the haste with which the certification determination was made. We do not have the same procedural concerns here. The record clearly shows that, in the case *sub judice,* the trial judge used discretion and seriously considered the certification issues; in

a deliberate manner, he exercised his discretion. Indeed, the majority does not take issue with the manner in which the trial court exercised discretion, only the result of that exercise of discretion.

Whether his determinations are correct or not, the process the trial judge used to arrive at them, was clearly correct. When there is evidence, as in *Amchem Products,* that a trial court did not take the proper steps to certify a class, then there may be some evidence of an abuse of discretion and, therefore, justification for issuing mandamus. That is not the case here.

The trial court's exercise of discretion in formulating the issues and scope of class actions is not final until, at least, the commencement of the trial on the merits. In fact, it may not achieve finality until final judgment is rendered. As I see it, the view espoused by the majority makes the trial court's exercise of discretion, even at the very beginning of the proceedings, a final exercise of discretion. This is inconsistent with Rule 2–231 and with the view taken by courts in other jurisdictions.

In consolidated appeals after final judgment had been entered, the District of Columbia Court of Appeals recognized the importance of allowing a trial court wide discretion in reviewing certifications of class actions:

> When seeking class certification, a plaintiff must meet each of the four requirements of Super. Ct. Civ. R. 23(a).... [3] The party seeking certification has the burden of showing that the request for class certification complies with the requirements of the rule. Whether that burden has been met is a matter entrusted to the trial court's discretion, and its decision will not be reversed unless that discretion has been abused.

*Cowan v. Youssef,* 687 A.2d 594, 602 (D.C.1996) (footnote omitted) (citing *Yarmolinsky v. Perpetual Am. Fed. Sav. &*

---

**3.** The language of Maryland Rule 2–231 and D.C.Super. Ct. Civ. R. 23 are nearly identical.

*Loan Ass'n,* 451 A.2d 92, 94 (D.C.1982)); *see also In re NLO, Inc.,* 5 F.3d at 157 (stating that trial courts "unquestionably have substantial inherent power to manage their dockets."); *Ex Parte Gold Kist, Inc.,* 646 So.2d 1339, 1341 (Ala.1994) (noting that "class certification is generally left to the sound discretion of the trial court.").

The Supreme Court of Tennessee has also held that it is generally premature for an appellate court to second guess a trial judge's exercise of discretion in certifying a class: "the determination of whether an action should proceed as a class action is a matter which is left to the sound discretion of the trial judge. Only upon a finding of an abuse of that discretion should the trial judge's decision be modified *on appeal.*" *Meighan v. U.S. Sprint Communications Co.,* 924 S.W.2d 632, 637 (Tenn.1996) [hereinafter *Meighan I* ] (emphasis added) (citing *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988)). That court pointed out as well that "[i]t is well established that the existence of separate issues of law and fact, particularly regarding damages, do not negate class action certification." *Id.; see also* Amendments to Rules of Civil Procedure, 39 F.R.D. 69, 103 (1966) (noting that an act of fraud against numerous persons is an "appealing situation" for a class action suit, despite the separate level of damages each party may have). Reflecting on the trial judge's ability to amend and change the limits of the class, the *Meighan I* court stated: "it is properly the trial court's prerogative to make the initial determination of and any subsequent modifications to class certification. The trial court retains significant authority to redefine, modify, or clarify the class." *Meighan I,* 924 S.W.2d at 637.

### III. Class Certification

The prerequisites to a class action are outlined in Rule 2–231:

(a) *Prerequisites to a class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are ques-

tions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) *Class actions maintainable.* Unless justice requires otherwise, an action may be maintained as a class action if the prerequisites of section (a) are satisfied, and in addition:

. . . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions, (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class, (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum, (D) the difficulties likely to be encountered in the management of a class action.

Subsection (a)(1) requires, for class certification, that the class be so numerous that joinder of all members is impracticable. In the case *sub judice,* the plaintiffs allege, petitioners do not contest, and the trial judge determined, that the class consists of tens of thousands of Maryland citizens. Clearly, a class of that size would justify class certification. But, for our purposes, whether his determination is correct or not, the trial judge did address this factor.

To meet the requirements of Rule 2–231(a)(2), there must be found to be questions of law or fact common to the class. When initially considering the issue of commonality, the standard is relatively low because the " 'commonality' requirement is subsumed under, or superseded by, the more stringent [Federal] Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions." *See Amchem*

*Prod.*, 521 U.S. at 609, 117 S.Ct. at 2243, 138 L.Ed.2d 689. Generally, therefore, this requirement is relatively easy to satisfy and "there need be only a single issue common to all members of the class." 1 Newberg, *supra,* § 3.10, at 3–50.

In the case *sub judice,* the plaintiffs' complaint and class certification motion allege numerous questions of law and fact that may be common to the class, including whether cigarettes and smokeless tobacco products are addictive, whether the defendants manipulated nicotine levels in their products, whether the defendants conspired to conceal and distort the results of their tobacco research, and whether affirmative defenses are available. It is the function, initially, of the trial judge to determine whether there are significant " 'issues involved [that] are common to the class as a whole' and ... 'turn on questions of law applicable in the same manner to each member of the class.' " *General Tele. Co. v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 2369, 72 L.Ed.2d 740 (1982) (quoting *Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557, 61 L.Ed.2d 176 (1979)). Again, whether correctly or not, these issues were addressed by the trial judge.

Rule 2–231(a)(3) requires a factual finding that the claims or defenses of the representative parties are typical of the claims or defenses of the class. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of varying fact patterns which underlie individual claims." 1 Newberg, *supra,* § 3.10 at 3–77. The plaintiffs in the case *sub judice,* at the least, allege a common course of deceptive conduct by defendants that was designed to create and sustain addiction to nicotine. Again, regardless of the correctness of his ruling, the trial judge addressed the issue.

Rule 2–231(a)(4) requires the trial judge to find that the representative parties will fairly and adequately protect the interests of the class. Petitioners contend that this requirement was not met because an impermissible conflict of interest prevents class counsel from adequately representing the puta-

tive class. The trial judge considered this argument and ruled that there was no impermissible conflict of interest. His rationale was that the issue of this type of dual representation had been implicitly approved by this Court. *See Attorney Grievance Comm'n v. Harlan,* 320 Md. 571, 578 A.2d 1196 (1990). Additionally, "[a] possible conflict does not itself preclude the representation." Md. Rule of Professional Conduct 1.7 cmt. Whether ultimately determined on review to be correct or not, this finding was neither an abuse of discretion nor an usurpation of power.

In addition to meeting the four requirements of subsection (a), a class action must also fall within one of the four categories contained in subsection (b) of Maryland Rule 2–231. The trial judge determined that the plaintiffs met the requirements of Maryland Rule 2–231(b)(3), which requires the court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The judge, as required to do, considered both whether the issues predominate and whether a class action is the superior way to handle this case. With respect to whether a class action was the superior method available for the fair and efficient handling of the case, for example, the trial judge considered whether the class members would be better off handling their own lawsuits, whether existing litigation is so prolific that it would defeat the purpose of class action, whether all litigants should be forced into court, and whether the litigation is manageable as a class action. Whatever may be said as to the correctness of his conclusion, the trial judge certainly did not ignore the issue.

Had the trial judge not exercised discretion at all, I might perceive that issuance of an extraordinary writ was in order. Petitioners, however they couch the issue, ask us to preliminarily assess the correctness of the judge's exercise of discretion, not whether it was exercised. Correctness of the ruling, as I see it, is a matter for review in the normal appellate process. At that time, our review will be of the "final" class of

litigants that results from the trial judge's continued supervision and modification of the class.

Nor is there a basis in this record for concluding that the trial judge usurped his judicial authority. The trial judge's memorandum opinion, whether correct or not, is comprehensive, detailed, and specific, demonstrating only a deliberate effort to comply with Maryland Rule 2–231. The only rationale for decertifying this class at this point is that the majority would arrive at a different conclusion than the trial court on the set of facts presented. This, in my view, is neither a good nor a sufficient reason.

By the time this case would arrive here in the normal course, the facts established at trial may well be manifestly different, and the class may be different as well, as the trial court modifies and narrows the class in accordance with the pretrial development of the facts. The trial court's ultimate decision as to the size of the class might well be satisfactory to the entire Court. We will never know as the majority usurps the trial court's role in the process. This Court, as I see it, should not substitute its discretion for that of the trial judge, or determine that the trial judge has abused his discretion, at this early stage of the proceeding, when the exercise of discretion is supposed to be continuing, so that the final decision of the trial court may, or may not, be an abuse of discretion.

To hold otherwise sets a dangerous precedent. First, it improperly replaces the trial court's discretion with ours. Second, the situation may, in the end, not warrant such an extraordinary remedy. It also might serve to deny to the trial judge the initial deference in such matters to which the trial courts are entitled and might render the application of Rule 2–231 subject to a "yo-yo" system of appeals from class action certifications where the appellate courts, not trial courts, will end up certifying classes.

*In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.), *cert. denied,* 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995), cited by petitioners as a leading case in which manda-

mus was issued to vacate a class certification, provides an example of how appellate courts become involved in this "yo-yo" pretrial appeal process, ultimately weakening the final judgment rule. On remand from the grant of the writ, the trial court in that case apparently certified a new class. The defendants, having tasted victory in the first mandamus proceeding, challenged the plaintiffs' schedule of expert witnesses by again petitioning to the Seventh Circuit for the writ, which was refused. *See generally In re Rhone–Poulenc Rorer Pharm., Inc.*, 138 F.3d 695 (7th Cir.1998).

In another example, *In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir.1986),[4] the Third Circuit, hearing an interlocutory appeal under 28 U.S.C. § 1292(b), upheld a mass tort class certification for compensatory damages only. The defendants later moved to decertify the class, which the trial court denied. They petitioned the Third Circuit for a writ of mandamus to vacate the order, but the writ was denied. *See generally, In re School Asbestos Litigation*, 921 F.2d 1338 (3d Cir.1990). Later, the trial court denied the defendants' motion for partial summary judgment. The defendants for the third time petitioned the Third Circuit for a writ to overturn the trial court's order. *See generally In re Asbestos School Litigation*, 46 F.3d 1284 (3d Cir.1994).

These examples reflect exactly what can happen in class action lawsuits if this Court modifies the final judgment rule as it pertains to pretrial class action decisions. Every defendant in major civil litigation who is disappointed by an important pretrial ruling will contend that that defendant's case presents extraordinary circumstances justifying early appellate intercession. Holding that the writ should issue here confers on such defendants the power to stall. In turn, plaintiffs and witnesses will die, become impossible to locate, or their memories will fail. Evidence will disappear or be

---

4. The Supreme Court denied a writ of certiorari to the Third Circuit in two separate appeals. *See National Gypsum Co. v. School Dist. Of Lancaster*, 479 U.S. 915, 107 S.Ct. 318, 93 L.Ed.2d 291 (1986); *Celotex Corp. v. School Dist. Of Lancaster*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986).

destroyed with time. Plaintiffs will become discouraged and drop their suits or simply run out of money to fund them. At the same time, this Court will become more and more involved with supervising pretrial matters in major civil litigation. That is not the role we should assume except in the most extraordinary circumstances.

Chief Judge BELL and Judge RODOWSKY have authorized me to state that they concur with the views expressed herein.